SAMUEL MARTINO, SR. & others *vs.* THE FIRST NATIONAL
BANK OF BOSTON.

Suffolk.    October 7, 1971. — March 6, 1972.

Present: TAURO, C.J., CUTTER, REARDON, QUIRICO, & HENNESSEY, JJ.

*Option.   Contract*, Option.

In an action by stockholders of a bank seeking to enjoin an agent for
an undisclosed principal from selling, transferring, or voting their
stock deposited with the agent, and requesting a declaration that
option agreements, proxies and letters of transmittal under which
their shares were transferred to the agent were a nullity, there was
sufficient evidence to support the trial judge's findings that the
principal was not interested in purchasing the plaintiffs' shares
but needed an option to purchase the shares to protect himself in
the event he did not acquire the approval of the requisite number
of shareholders to effectuate a proposed consolidation of the bank
with another; and that conditions necessary for an exercise of the
option existed.   [328–329]

A trial judge's finding that there was a contest for control of one of
the two banks which were the subject of a proposed consolidation
was not plainly wrong even though control of the bank was sought
merely to facilitate the consolidation.   [329]

A finding in a suit in equity that an option to purchase shares of a
bank was not limited by any oral agreement not to exercise the
option unless the owners of the shares consented to sell was not
plainly wrong; nor were the terms of the option misrepresented to
the owners despite expressions of hope that there would be no
necessity to exercise the option.   [330–331]

A certain letter and enclosures sent by an agent for an undisclosed
principal to the stockholders of a bank stating, "As agent, we are
pleased to inform you of an offer with respect to your shares . . . .
The details of the offer are set out fully in the Option Agreement
[giving the agent an option to purchase the stock] and Transmittal
Letter which are enclosed," made the option agreement effective
upon the execution of the documents by a majority of the stock-
holders, without further action by the agent [331]; there was no
merit in a contention that certain language in the documents made
the stockholders offerors to the agent rather than acceptors of an
offer by him [331–332].

CUTTER, J., concurring in the result.

BILL IN EQUITY filed in the Superior Court on April 29,
1969.

The suit was heard by *Paquet*, J.

*Bernard Kaplan* for the plaintiffs.
*Robert J. Hallisey* (*Henry S. Healy* with him) for the defendant.

REARDON, J.   This is an appeal from a final decree of the Superior Court entered in a suit for declaratory and injunctive relief.   The plaintiffs, Samuel Martino, Sr., Samuel Martino, Jr., and Domenic Angelini, residents of Leominster, are stockholders of record and beneficial owners respectively of 124, 26, and 59 shares of common voting stock in The Merchants National Bank of Leominster (Merchants).   The plaintiffs sought an injunction restraining the defendant, The First National Bank of Boston (the First), from selling, transferring, or voting the stock in Merchants deposited with the defendant by the plaintiffs.   In addition, they sought a determination that the option agreements, proxies and letters of transmittal under which their shares were transferred to the First were a nullity.   The decree, however, declared these documents valid.   The case comes to us with a report of material facts and a report of the evidence.   G. L. c. 214, §§ 23 and 24.   The judge found as follows.

Prior to August, 1968, certain officers, directors and shareholders of the First Safety Fund National Bank of Fitchburg (Safety Fund) attempted to bring about a consolidation of that bank with Merchants.   Certain shareholders of Merchants favored consolidation.   The consolidation would require the approval of the holders of two-thirds of the shares of each bank.   In August, 1968, Safety Fund transmitted an offer to the stockholders of Merchants of 17½ shares of its stock for one share of Merchants' stock.

About August 2, 1968, Aaron Krock, a Worcester banker, offered through the New England Merchants National Bank of Boston (New England) to purchase the stock of Merchants for $1,000 a share, the offer to expire on August 30, 1968.   Later in August, Lawrence Mitchell, president of Safety Fund, arranged with the First to finance a counter-tender offer.   The First agreed

to make this offer and to act as agent for an undisclosed principal, Ronald Ansin, a director of Safety Fund.

On August 27, at his home, Mitchell explained the counter-tender offer to several "influential shareholders" of Merchants and some of the directors of Safety Fund. Present were the plaintiffs Martino, Sr., and Angelini. Explanation was given that the counter-tender offer would meet Krock's offer but that a tender of a majority of Merchants' shares was necessary to insure control in the hands of the undisclosed principal. It was stated that a two-thirds majority was required to accomplish consolidation of the two banks but that the counter-tender offer would become effective if a majority of the shares were tendered. Since the counter-tender included a guaranty to buy the shares of Merchants, it was necessary that the shareholders agree to sell sufficient shares to provide the majority. Those at the meeting agreed that it was desirable that the counter-tender offer succeed.

The following day another meeting was held at Mitchell's home, at which "several of Merchants' shareholders, including Martino, Sr., and some directors of Safety Fund were present." At this meeting Martino, Sr., objected to selling his shares. He desired the merger but also wanted to retain ownership of his shares. Mitchell explained that the principal did not wish to purchase the shares but required an option to buy to protect himself in the event he failed to get a two-thirds majority to complete the merger since, for example, he did not wish to become a minority stockholder. Mitchell presented the documents which Martino, Sr., signed. They were signed by the other plaintiffs the next day.

Although a majority of the shareholders had agreed to the counter-tender offer, and a total of 1,058 shares had been delivered to the First by September 24, 1968 (there were at the time 2,000 shares of Merchants outstanding), by April, 1969, it was apparent that the counter-tender offer would not attract the necessary two-thirds vote. The option was due to expire under the basic documents on May 20, 1969. Ansin decided to seek a three year ex-

tension of the offer in the hope that Krock would see his position as untenable and accede to consolidation of Merchants and Safety Fund. The three plaintiffs refused to agree to the extension and demanded the return of their shares. Ansin declared that if the extension were not agreed to within a week of April 23, 1969, the date when he announced his intention to seek the extension, he would exercise his option and buy their shares since Krock was now offering as high as $1,500 a share to certain shareholders. At the meeting when Ansin made his proposal, Angelini admitted he had signed an agreement to sell his shares to New England for $1,300 each if he could get them released by the First. The plaintiffs shortly thereafter brought this bill.

1. The plaintiffs challenge the findings of the trial judge which tend to show that they agreed to the possible exercise of the defendant's option to buy their shares in the circumstances prevailing in April, 1969. In this case, with the report of evidence and the findings of material facts, all questions of fact, law and discretion are open to us, but the findings of fact will not be set aside unless they are plainly wrong. *Willett* v. *Willett*, 333 Mass. 323, 324. *Cline* v. *A. A. Will Sand & Gravel Corp.* 346 Mass. 40, 42. "A report of material facts under the statute must contain every fact necessary to support the decree, from the entry of which no fact not expressly found may be implied. . . . If the reported facts do not support the decree, it must be reversed unless the evidence reported shows that it was nevertheless right." *Cohen* v. *Santoianni*, 330 Mass. 187, 190, and cases cited. Thus, if the plaintiffs are to succeed they must show not only that the judge's findings were plainly wrong but that based on the evidence the decree upholding the validity of the agreements and the defendant's action under them was erroneous.

We hold that the findings of the judge concerning the circumstances that would cause the defendant to exercise its option to purchase the plaintiffs' shares were not plainly in error. The judge's finding that "Mitchell

stated that The First's principal was not interested in
purchasing the shares but had to have an option to buy
them in order to protect himself in the event he did not
get the two-thirds majority to complete the merger be-
cause he did not want to end up owning less than a ma-
jority of the shares" is correct.   While the full text of
the relevant portions of the transcript speaks in terms of
a minority ownership caused by a forced purchase of
some of the stock, the trial judge's conclusion is not
plainly wrong.   It describes in essence an example of a
condition requisite to exercise of the option.[1]

The plaintiffs also argue that the judge was in error in
the finding that the contest between Ansin and Krock was
for "control" of Merchants.   The ultimate goal of Ansin
was the consolidation of Merchants with Safety Fund.
However, an intermediate step to this goal was Safety
Fund's control of Merchants.   This was accomplished
when a sympathetic management of Merchants was
elected at the annual meeting in January, 1969, and it is
not without significance that this slate of officers was
placed in nomination by Martino, Sr.   Thus, control was
one element in the situation.   The judge viewed control
not at the heart of the purpose of Ansin and Mitchell but
only as a stepping-stone to advance the cause of consoli-
dation.   The findings of the judge as to control are
justified.

The plaintiffs argue further that the judge was in
error in finding that the plaintiffs decided to withdraw
from the Mitchell-Ansin group because of the stalemated
situation and the delay involved in its resolution.   The
court referred to the negotiations of the plaintiffs with

---

[1] The plaintiffs complain that the judge erred when he found that at
the August 27 meeting "[i]t was explained that, since the counter-
tender included a guarantee to buy the shares of Merchants, it was
necessary that the shareholders agree to sell in order to provide the
majority and forestall a situation whereby the counter-tender offeror
would be left in a minority position if, for example, New England
obtained a majority of the shares."   While this finding when taken
out of context may give rise to question since the counter-tender was
effective only if the holders of a majority of the shares subscribed to
it, no such question survives a reading of the entire set of findings.

others to sell their shares "for the highest dollar" and their inability to complete those negotiations because of the signed option agreement. This finding was justified. Angelini's son testified that following the bringing of this suit his father had agreed to sell his stock to Krock for $1,300 a share, and the two Martinos testified that they had been offered varying amounts for their shares in excess of the option price although Martino, Jr., declined the offers. The judge could reasonably have concluded that the plaintiffs engaged in negotiations to sell their stock at a price higher than that stipulated in the counter-offer. The findings taken as a whole are not plainly wrong. They depict in substantially accurate fashion the chronology of events leading to the present suit.

2. The plaintiffs claim that the defendant disregarded its agreement with them when it exercised the option to purchase. The option agreement gave to the plaintiffs the right to sell their shares at the rate of $1,000 a share any time after March 1, 1969. In addition, there was given to the First the right to buy at the same price at any time after the date of the option agreement. The plaintiffs press an argument that the defendant's principal, in order to persuade the plaintiffs to enter the agreement, was orally committed not to exercise the option unless the shareholders exercised their option to sell. The plaintiffs argue that since the defendant attempted to exercise the option the defendant has not lived up to its agreement and that they are entitled to return of their shares. While the defendant responds that this argument is improper since it was neither raised in the bill nor in the trial court and, hence, cannot be raised here for the first time, we find that paragraph No. 16 of the plaintiffs' bill states that the option given the defendant would never be exercised. In addition, the testimony of several witnesses questions the scope of the power under the option. We thus consider the contention. It was open to the judge to find that there was no specific agreement collateral to the written one limiting the exercise of the defendant's option. To be sure, there were expres-

sions of hope and desire on the part of Ansin and Mitchell that they would not be forced to exercise the option, but there is no express promise of the type claimed by the plaintiffs. The judge has found no misrepresentation practised on the plaintiffs by Ansin or others associated with Safety Fund, and we see no error in this finding.

3. The plaintiffs argue that the option agreement required First's acceptance within thirty days of August 29, 1968. We hold, however, that the option agreement was effective upon the execution of the documents by the holders of at least a majority of Merchants and that it was not necessary for the defendant to act further. All of this was accomplished by August 30, 1968. It is the plaintiffs' argument that the provision for the defendant's acceptance at the bottom of the option agreement makes the First's signature at that point a prerequisite to binding the parties, but looking at the associated documents together we reach the opposite conclusion. The First sent the stockholders a letter dated August 28, 1968, stating, "As agent, we are pleased to inform you of an offer with respect to your shares . . . .. The details of this offer are set out fully in the Option Agreement and Transmittal Letter which are enclosed." The argument of the plaintiffs is that this letter does not make it clear that the defendant is the offeror but that it is simply "passing along a proposal in behalf of another." We, however, read the letter as a tender by the First as an agent making an offer, the details of which are to be found in the documents covering the transmittal letter.

The plaintiffs argue that the option agreement that accompanies the covering letter seems to suggest that the stockholder is the offeror. The first sentence of that agreement says, "This constitutes our Agreement to the following offer." Because the pronoun "our" is employed in this sentence, the plaintiffs argue that the sentence refers to the stockholder as offeror. If this document means that the stockholder was accepting an offer, the pronoun "my" would have been used in place of "our," say the plaintiffs. Again we disagree. Con-

sidering the option agreement and the covering letter together, we read the sentence to mean that upon the signature of the stockholder the offer as it is spelled out in the option agreement is accepted. Thereupon the offer is effective as between the stockholder and the First. The option agreement is to be read in the context of the letter from the First to the stockholder. If the signature by the stockholder constituted an offer and not an acceptance of an offer, then the sentence in question would more probably have read in terms of a tender of an offer rather than in terms of an agreement. We read the sentence as confirmation of an agreement from the stockholder to the First. We do not read it as an offer to the defendant.

That a blank for the First's signature appears at the end of the agreement does not alter our conclusion. This blank reads:

"Accepted:

_____
Signature

THE FIRST NATIONAL BANK OF BOSTON  _____
Number of Shares

By:_____ "

This blank makes provision for acknowledgment by the defendant of the receipt of the agreements and is not essential to the validity of the contracts themselves.

We are confirmed in the conclusion we reach by the activities of the parties themselves who from August, 1968, acted as though the agreements were effective. We refer again to the vote of proxies in the election of the new Merchants management. "There is no surer way to find out what parties meant, than to see what they have done." *Pittsfield & North Adams R.R.* v. *Boston & Albany R.R.* 260 Mass. 390, 398, quoting from *Insurance Co.* v. *Dutcher,* 95 U. S. 269, 273.

4. In view of our disposition of this matter we need not discuss the question of laches by the plaintiffs which

has been extensively argued to us. Nor do we discuss several other contentions of the plaintiffs which appear to us without merit.

*Decree affirmed with costs of appeal.*

CUTTER, J. (concurring) I concur in the result. I am convinced that the judge's clear subsidiary findings concerning a complicated situation were justified by the evidence, and amply permit his significant conclusions: (a) that no false statements or misrepresentations of Mitchell or Ansin influenced the plaintiffs to sign the option agreements in August, 1968; (b) that no such misrepresentations were made; and (c) that the plaintiffs' serious delay until late April, 1969, in pressing objections to the procedure used in August, 1968, was prejudicial to Ansin, and constituted laches barring the plaintiffs from relief.