STUART L. HARROD & another[1] *vs.* ELMER RIGELHAUPT & another.[2]

Barnstable.    November 14, 1972, May 18, 1973. — June 29, 1973.

Present: HALE, C.J., KEVILLE, & GRANT, JJ.

*Real Property,* Equitable restrictions.  *Equity Jurisdiction,* Equitable restrictions.

An owner of a tract of land to which no zoning law applied, who registered with the Land Court nine subdivision plans of portions of the tract, and whose deeds to parcels of the tract recited that they were conveyed "subject to and with the benefit of" certain restrictions which were to extend until the year 2050 and were "binding upon" and for "the benefit of" the grantor and the grantees and their "heirs and assigns," intended by the restrictions a common scheme of development. [378-384]

G. L. c. 184, § 30, did not preclude specific enforcement in a suit in equity of a building height restriction in a deed, where it appeared that an addition to a house of the defendants, exceeding the height, interfered with the plaintiffs' view and privacy, that public controls did not reduce the need for the restriction or make it obsolete, and that the defendants completed the addition with knowledge of the restriction and the risk of its enforcement. [384-387]

BILL IN EQUITY filed in the Land Court on June 16, 1970.

The suit was heard originally by *McPartlin,* J., and on remand by *Randall,* J.

───────────────

[1] Kathleen T. Harrod, wife of Stuart L. Harrod.

[2] Eleanor Rigelhaupt, wife of Elmer Rigelhaupt.

*Bertram H. Loewenberg & William T. Loomis (Robert F. White* with them) for the defendants.

*Francis E. Jenney* for the plaintiffs.

GRANT, J.   This is a bill in equity brought in the Land Court for declaratory and injunctive relief with respect to a restriction on the height of buildings in an alleged scheme of common development of land in Wellfleet.[3] The case was originally submitted on a statement of agreed facts which the parties said included all the facts and documents (including photographs) material to the case and necessary for the court's determination. The defendants appealed from a final decree which, in effect, ordered them to remove the newly constructed addition to their house and permanently enjoined them from maintaining a building which should exceed fifteen feet in height above the lowest point of the grade adjacent to the building. Being of opinion that the record did not contain certain documents material to the existence or not of a common scheme and that the statement of agreed facts did not include sufficient facts to make the determinations required by the first paragraph of G. L. c. 184, § 30 (as inserted by St. 1961, c. 448, § 1), we discharged the statement in part and remanded the matter to the Land Court for the expansion of the record by the inclusion therein of certain documents and for an evidentiary hearing on the factors set out in said § 30. See G. L. c. 185, § 1 (k); G. L. c. 231, §§ 124, 125 and 144; G. L. c. 211A, §§ 10 and 13; *Butler* v. *Haley Greystone Corp.* 352 Mass. 252, 253 (1967). The court was directed to make, and now has made, findings of fact with respect to each of the factors under § 30 and has reported all the evidence on which those findings are based. It has reconsidered and has specifically confirmed the final decree in the light of such findings.[4]

---

[3] The bill was not brought under the provisions of G. L. c. 240, §§ 10A through 10C, inserted by St. 1961, c. 448, § 3.

[4] All proceedings pursuant to remand were conducted by the judge of the Land Court following the retirement of the associate judge by whose order the final decree was originally entered.

## THE ALLEGED SCHEME OF COMMON DEVELOPMENT.

The common grantor was one Henderson, who was not a commercial developer but a practicing lawyer in New York City who (or whose wife) owned a summer home in Wellfleet several miles to the south of and out of sight from the development in question. In 1949 Henderson's title to the entire area shown on the accompanying sketch plan[5] was confirmed and registered under the provisions of G. L. c. 185. In December of that year Henderson conveyed Lots B and C to his wife by a deed which contained no restrictions.[6] The deeds out from Henderson of Lots J-1 through J-10 and J-12 through J-17[7] (see fn. 5) range in date from November of 1952 through January of 1959 and contain the provisions presently to be discussed. All the lots comprised portions of the original Lot A, which appears to have contained more than 400 acres of land prior to any subdivision. The lots lying southerly of Lot J-13 (which contained 315.95 acres) range in size (where disclosed) from 3.66 to 9.10 acres. By the time of Henderson's conveyance out of Lot J-17 nine separate subdivision plans of portions of Lot A had been registered in the Land Court on dates ranging from May of 1952 to May of 1957. Henderson died in 1961. On his death the unsold portions of Lot A passed to his wife, who in 1965 conveyed them to the United States of America to become parts of the Cape Cod National Seashore established in 1961 under Pub. L. 87-126, 75 Stat. 284.

Except as otherwise indicated, the following language appears in the original deeds out of all the lots lying

---

[5] The separate boundaries of Lots A (which was later subdivided), B and C which appear on the sketch plan were all located and determined by a plan registered in the Land Court as early as 1943. The "J" designations on the sketch plan have reference to particular exhibits attached to the statement of agreed facts, and not to specific plans registered with the Land Court. For the sake of convenience we shall refer to the areas so depicted as Lots J-1, J-2, etc.

[6] There is a suggestion in the record that Henderson's wife was already the registered owner of land lying southerly of Lot C.

[7] There is no Lot J-11, the deed in question being concerned with grants of easements to public utility corporations.

Harrod *v.* Rigelhaupt.

southerly of Lot J-13,[8] and the defendants' transfer certificate of title recites that their lot "is subject to and has the benefit of the restrictions set forth" in such language: "Said premises are hereby conveyed subject to and with the benefit of the following provisions which shall be binding upon and inure to the benefit of the Grantor and Grantee and their respective heirs and assigns, except as hereinafter limited." Seven specific provisions[9] follow, many of which resemble common provisions of zoning by-laws and appear to reflect the fact that no part of Lot A was subject to any zoning by-law of the town of Wellfleet during Henderson's lifetime. The first provision is to the effect that only single family dwellings shall be allowed to stand on the granted premises and that no business of any nature shall be conducted thereon. The second provision is concerned with building materials and concludes with the prohibition that "[n]o prefabricated, metal, sectional or portable buildings shall be erected or allowed to stand upon the granted premises without the written consent of the Grantor during his lifetime and thereafter with [sic] the written consent of the owners of all land immediately adjoining the granted premises."[10]

The third provision, critical in this case, reads in pertinent part as follows: "During the life of the Grantor no

---

[8] The deed of Lot J-4 restricts the use of that lot to agricultural purposes until the year 2000. The deed of Lot J-13 permits the construction and operation of a clubhouse (with or without apartments or restaurant), tennis courts and swimming pools in the northwesterly corner thereof but restricts the southerly portion to uses substantially similar to those permitted in the language under discussion. No part of Lot J-13 is subject to any express restriction on the height of structures. It will be noted that that lot lies entirely northerly of the ways which branch off from Griffin's Island Road northerly of Lots J-8 and J-17. The defendants do not argue that the differences in restrictions applicable to Lot J-13 militate against the existence of a common scheme of development south of that lot and north of Lot B. See *Snow* v. *Van Dam,* 291 Mass. 477, 481 (1935), and cases cited.

[9] There are actually eight provisions in the deeds, but the operation of the eighth provision was expressly limited to expire on January 1, 1970, and is not here material.

[10] This provision also requires compliance "with the requirements of the building code of the Town of Barnstable, unless a building code of the Town of Wellfleet imposes a different requirement."

building shall be erected on the granted premises except in accordance with plans and specifications which shall have been approved in writing by the Grantor . . .. After the death of the Grantor, (a) no building shall be erected on the granted premises (i) unless the design is suitable to the area and will not unduly obstruct the view from adjoining plots, (ii) which shall consist of more than two stories, cellar and attic, and, if it is located upon a hilltop,[11] or if the roof line will rise above adjacent hilltops, which shall exceed 15' in height,[12] from the lowest point of the grade adjacent to the building to the highest point of the roof or of any projection other than chimneys, or aerials, extending above the roof . . .." The fourth through seventh provisions are concerned with setbacks of structures from boundaries, with the installation of underground utility services, and with prohibitions against signs, earth removal and various offensive and noisome uses. At the conclusion of the foregoing provisions there appears the following: "9. The restrictions established by the preceding paragraphs . . . shall remain in force until January 1, 2050 . . . and all said restrictions are imposed for the benefit of the remaining land of the Grantor . . . [in Lot A] but no owner shall be liable except for breaches occurring during such owner's ownership."

The plaintiffs purchased Lot J-6 by a deed dated August 18, 1954, and thereafter proceeded to construct the original portion of the house in which they now live. They purchased Lot J-15, which remains vacant, by a deed dated August 19, 1957. Lot J-17 was purchased by the defendants' immediate predecessor in title by a deed dated January 16, 1959, and she thereafter proceeded to construct the original portion of the house which is now in dispute. The defendants purchased Lot J-17 and the original house thereon on

---

[11] It is agreed that the plaintiffs' and defendants' respective houses are located on hilltops.

[12] A figure of twenty feet was employed in the deeds of Lots J-1 through J-5 (except Lot J-4). The fifteen foot figure was used in all the subsequent deeds except the deed of Lot J-13.

November 16, 1966. In March of 1970, under circumstances which will appear more fully in a later portion of this opinion, the defendants commenced the construction of an addition to their house which, it is agreed, is approximately twenty-six feet in overall height measured from the lowest point of the grade adjacent to the building.

The parties are in agreement that the existence or not of a common scheme of development is to be determined by the intent of Henderson, the common grantor, in the light of all the attendant circumstances. See *Snow* v. *Van Dam,* 291 Mass. 477, 481 (1935), and cases cited.

The defendants point to the absence of any recorded (registered) plan of subdivision of all of Lot A at the time Henderson commenced the sale of the J lots as indicative of a lack of intention on his part to create and impose a common scheme. It is true that there was no such overall plan here. However, two subdivision plans of portions of Lot A had already been registered in the Land Court by the time of the sale of Lot J-1, and these were followed by an orderly progression of seven other subdivision plans as further sales were made. Such a pattern of subdivision plans and ensuing sales undoubtedly reflected the considerable time and expense involved in securing the necessary authorizations from the Land Court for the issuance of separate certificates of title to the various portions of Lot A and, in our opinion, does not stand in the way of a determination that Henderson had a common scheme of development in mind at the time he commenced his sales. See *Snow* v. *Van Dam,* 291 Mass. 477, 478-479, 480, 485-486 (1935); *Ward* v. *Prudential Ins. Co. of America,* 299 Mass. 559, 563-564 (1938). See also *Storey* v. *Brush,* 256 Mass. 101, 105-106 (1926).

The defendants' principal arguments against the existence of such a scheme are ones concerning the proper construction of the language of the various provisions previously summarized or quoted. In essence the arguments are that all restrictions were personal to Henderson, whose intention went no further than to benefit such remaining portions of Lot A as he might continue to own at

the time of his death, which did not include the plaintiffs' lots. We cannot accede to such arguments. Henderson himself owned no home or other structure located in Lot A which he might have been desirous of protecting. The preface to the restrictions recites that "[s]aid premises are . . . conveyed *subject to and with the benefit of* the following provisions which shall be *binding upon and inure to the benefit of the* Grantor and *Grantee and* their respective *heirs and* assigns . . ." (emphasis supplied). The year 2050, when the restrictions were to expire, was almost one hundred years distant at the time of the 1952 sale of Lot J-1[13] and well beyond Henderson's own life expectancy.

The restriction on the height of buildings was but one of numerous restrictions on the general uses which could be made of the lots which were being conveyed out of Lot A. There was no zoning by-law of the town of Wellfleet then applicable to any part of Lot A, and we have already noted Henderson's concern with the general lack of public controls over the use of that land (see fn. 10). We perceive a general intention on his part to create by express restrictions a system of private zoning for the benefit of and of general application to all of Lot A. Henderson would personally supervise and approve the design and suitability of the houses which might be constructed southerly of Lot J-13 during his lifetime (compare *Patrone* v. *Falcone,* 345 Mass. 659, 660-661, 663 [1963]; *Donoghue* v. *Prynnwood Corp.* 356 Mass. 703, 705, 706-707 [1970]; see also *Houghton* v. *Rizzo,* 361 Mass. 635, 637-638 [1972]), but his own personal (and otherwise unworkable) standards were to be replaced, after his death, by the objective standards specifically set out in the restrictions, and in particular by the fifteen (earlier twenty)-foot height restriction set out in paragraph 3(a) (ii) thereof.[14]

---

[13] See G. L. c. 184, § 23, which provides in pertinent part that "[c]onditions or restrictions, *unlimited as to time,* by which the . . . use of real property is affected, shall be limited to the term of thirty years after the date of the deed . . . creating them . . ." (emphasis supplied).

[14] We do not believe Henderson's general intention was negatived by the provision in paragraph two of the restrictions, previously noted, to the general

We hold that there was here a common scheme of development within the meaning of and the rules laid down in *Snow* v. *Van Dam,* 291 Mass. 477, 481-486 (1935), and that there is appurtenant to the plaintiffs' Lots J-6 and J-15 a right to specific enforcement of the fifteen-foot height restriction against the building located on the defendants' Lot J-17 unless such enforcement should be precluded by one or more of the factors set out in G. L. c. 184, § 30. See, in addition to the *Snow* case, *Gilbert* v. *Repertory, Inc.* 302 Mass. 105, 107 (1939); *Sterling Realty Co.* v. *Tredennick,* 319 Mass. 153, 157-158 (1946); *Rahilly* v. *Addison,* 350 Mass. 660, 663 (1966); *Canty* v. *Donovan,* 361 Mass. 879 (1972); G. L. c. 184, § 26, subsec. 5. Cf. *Lovell* v. *Columbian Natl. Life Ins. Co.* 294 Mass. 473, 477-479 (1936).

THE FACTORS SET FORTH IN G. L. c. 184, § 30.[15]

The judge of the Land Court, following the remand from this court, took a view of the premises of the parties in the

effect that after his death only the immediate abutters need be consulted for permission to erect prefabricated, metal, sectional or portable buildings. The sizes of the various lots were such that buildings of those types would be of legitimate concern only to those persons whose properties should abut on a particular lot.

[15] The first paragraph of § 30, inserted by St. 1961, c. 448, § 1, reads as follows: "No restriction shall in any proceeding be enforced or declared to be enforceable, whether or not the time for recording a notice or extension under section twenty-seven or twenty-eight has occurred, or such a notice or extension has been recorded, unless it is determined that the restriction is at the time of the proceeding of actual and substantial benefit to a person claiming rights of enforcement. No restriction determined to be of such benefit shall be enforced or declared to be enforceable, except in appropriate cases by award of money damages, if (1) changes in the character of the properties affected or their neighborhood, in available construction materials or techniques, in access, services or facilities, in applicable public controls of land use or construction, or in any other conditions or circumstances, reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes or render it obsolete or inequitable to enforce except by award of money damages, or (2) conduct of persons from time to time entitled to enforce the restriction has rendered it inequitable to enforce except by award of money damages, or (3) in case of a common scheme the land of the person claiming rights of enforcement is for any reason no longer subject to the restriction or the parcel against which rights of enforcement are claimed is not in a group of parcels still subject to the restriction and appropriate for accomplishment of its purposes, or (4) continuation of the restriction on the parcel against which enforcement is claimed or on parcels remaining in a common scheme with it or subject to like restrictions would impede reasonable use of land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner

company of their counsel. Following the view and the taking of evidence the judge found that the fifteen-foot height restriction is of actual and substantial benefit to the plaintiffs and that none of the factors listed in § 30 precludes the enforcement of that restriction in equity. We review those findings in the light of the standards normally applied in appeals in equity where all the evidence has been reported and the judge has filed a report of all the material facts upon which the final decree is based. See G. L. c. 185, § 15A; G. L. c. 214, §§ 23 and 24; *Martino* v. *First Natl. Bank,* 361 Mass. 325, 328 (1972). We confine our discussion to the questions argued by the parties, except that we refrain from further elaboration on the existence of a common scheme.

1. We summarize the subsidiary findings, all of them warranted by the evidence, made by the judge under the first sentence of § 30. Lot J-6 slopes from Griffin's Island Road to the top of a hill (see fn. 11). The plaintiffs were originally attracted to the lot by its gorgeous view, its size and its seclusion. After purchasing the lot in 1954 they proceeded to construct a house thereon (which did not exceed twelve feet in height) which they moved into in the summer of 1955. They purchased Lot J-15 in 1957. For approximately fifteen years, until the construction of the twenty-six foot high addition to the defendants' house, the plaintiffs could see no house from their property except the defendants' original house (roughly 600 feet distant from the plaintiffs' house), of which they could see only the chimney and a television antenna. The defendants' two-story addition is clearly visible from part of the plaintiffs' house and from other parts of the plaintiffs' property,

inconsistent with the public interest or to contribute to deterioration of properties or to result in decadent or substandard areas or blighted open areas, or (5) enforcement, except by award of money damages, is for any other reason inequitable or not in the public interest." The parties have proceeded on the assumption, as do we, that § 30 was intended to apply to restrictions created and imposed prior to its effective date. See Thirty-Sixth Annual Report of the Judicial Council, 1960 Pub. Doc. No. 144, pp. 81-82; *Walker* v. *Sanderson,* 348 Mass. 409 (1965); *Labounty* v. *Vickers,* 352 Mass. 337, 347-348 (1967); *Canty* v. *Donovan,* 361 Mass. 879 (1972).

particularly from Lot J-15. Their view (as determined by the judge's view) has been impaired by the addition. The plaintiffs' privacy has been invaded and lessened by the construction of the addition, and the amenities of their property have been impaired. The judge's ultimate finding was that the restriction is of "actual and substantial benefit" to the plaintiffs. After careful consideration we find ourselves unable to pronounce that finding plainly wrong, either as matter of fact or as matter of law.

2. We concur with the judge's findings that changes in applicable public controls have not reduced materially the need for the height restriction or the likelihood of its accomplishing its original purpose, or rendered the restriction obsolete. The combined effects of §§ 4(b) and (d) and 5(b) of Pub. L. 87-126, 75 Stat. 284, 289-291, and of §§ 2.3.1 (I) and 2.3.4 of the zoning by-law belatedly adopted by the town of Wellfleet in 1966[16] did not prevent the local authorities (after notice to the Secretary of the Interior) from granting a building permit to the defendants for the construction of the twenty-six foot addition.

3. In 1969 the plaintiffs commenced the construction of an addition to their house, no part of which exceeded fifteen feet in height. Construction of the addition to the defendants' house commenced on or about March 10, 1970. By May 11 it became obvious from the framing and otherwise that a second story was contemplated. On that day one of the plaintiffs orally advised the defendants that their addition might be in violation of certain restrictions.[17] The defendants immediately consulted counsel, who advised them to suspend construction pending a determination of the applicability of any restrictions to the proposed addition. Construction was resumed on or about May 22. On

---

[16] See 2 U. S. Code Cong. & Adm. News (1961) pp. 2212, 2231-2236.

[17] The defendant Elmer Rigelhaupt testified, but the judge was not required to believe, that he was previously unaware of any restriction affecting the defendants' property. As we have already noted, all nine paragraphs of restrictions were in the defendants' direct chain of title and were expressly referred to on the face of their transfer certificate of title.

June 16, 1970, the present bill was filed, and a temporary restraining order against further construction was issued on the same day. If the defendants had ceased all construction at that point, the addition could have been closed in and protected from the elements at an approximate total cost of $3,500. Following the filing by the plaintiffs of a petition for contempt for violation of the court's order, some form of agreement (presumably without prejudice) was negotiated between counsel under which the defendants have proceeded to complete the exterior of the addition, which the judge found from his view is now complete except for some interior plastering. It is agreed that it would now cost the defendants approximately $15,000 to alter the addition in such fashion as to comply with the fifteen-foot height restriction. We agree with the judge's findings that the defendants chose to proceed with the addition knowing of the risks involved and that it would not be inequitable to grant specific performance of the restriction. See *Gilbert* v. *Repertory, Inc.* 302 Mass. 105, 108 (1939); *Sterling Realty Co.* v. *Tredennick,* 319 Mass. 153, 157-158 (1946); *Canty* v. *Donovan,* 361 Mass. 879 (1972). Cf. *Brown* v. *Linnell,* 359 Mass. 446, 447-448 (1971).

## CONCLUSION.

The first, second and third paragraphs of the final decree are to be modified so as to refer only to and to contain the language of the fifteen-foot height restriction set out in paragraph 3(a) (ii) of the restrictions discussed in this opinion (see below). The third paragraph of the decree is to be further modified so as to provide that the defendants are enjoined from violating said restriction (so phrased) at any time prior to January 1, 2050, or the date on which said restriction might expire by reason of the provisions of G. L. c. 184, § 28 (inserted by St. 1961, c. 448, § 1), whichever first occurs. The fourth paragraph of the decree is to be modified so as to provide a definite reasonable time (as determined by the court) within which the defendants are to remove so much of the addition to their house as exceeds

fifteen feet in height from the lowest point of the grade adjacent to the building to the highest point of the roof or of any projection other than chimneys, or aerials, extending above the roof. As so modified the final decree is affirmed. The plaintiffs are to have costs of appeal.

*So ordered.*