Fabricant, Judith, J.
INTRODUCTION
This action arises from the termination of the plaintiffs employment as the defendant’s vice president and general counsel. After dismissal of certain counts, two counts of the complaint remain, both alleging breach of contract. Now before the Court is the defendant’s motion for summary judgment on those two counts. For the reasons that will be explained, the motion will be allowed.
BACKGROUND
The record[1] before the Court establishes the following facts as undisputed.[2]
The defendant, Cynosure, Inc., is in the business of manufacturing laser products. The plaintiff, Emmanuel Crespo, was Cynosure’s Vice President and General Counsel, and a member of its Executive Committee, until his termination without cause on December 12, 2003. On or about May 3, 2002, an Italian company known as El. En. S.p.A (“El En”) acquired majority ownership of Cynosure. The acquisition was accomplished through the execution of a “Subscription Agreement” between El En and Cynosure, dated March 19, 2002. The subscription agreement provided, at section 6.1, that “[i]f any employee of Seller is terminated without Cause within 540 days following the Closing, such employee shall receive from Seller a cash payment equal to: (i) twelve (12) months salary plus pro rata bonus, if any, if such employee is member of Seller’s Executive Committee.” The subscription agreement further provided, at section 8.2(f), that certain named key executives, ofwhich Crespo was one, would enter into an employment agreement in a specified form.[3]
After execution of the subscription agreement, further negotiations occurred regarding the employment agreement. Crespo participated in those negotiations on behalf of Cynosure, and made specific proposals for revision of the sections relating to termination. His proposals did not change the language that is at the crux of the dispute in this case; that language appears in section 7.2 of both the form agreement and the version Crespo ultimately executed.[4]
Crespo executed an employment agreement, effective January 1, 2003. According to his deposition testimony, he did not read the document before he signed it. His agreement contains the following terms that bear on the issues presented by this motion.
3.1 Initial Term. The employment relationship pursuant to this Agreement shall be for an initial term commencing on the Effective Date set forth above and continuing for a period of three (3) years following such date (the “Initial Term”), unless sooner terminated in accordance with Section 7 below.
* * *
3.2 Renewal. On completion of the Initial Term specified in subsection 3.1 above, this Agreement will automatically renew for subsequent three (3) year terms unless either party provides three hundred (300) days’ advance written notice to the other that Company/Employee does not wish to renew the Agreement for a subsequent three (3)-year term. In the event either party gives notice of nonrenewal pursuant to this subsection 3.2, this Agreement will expire at the end of the then current term.
*391 4.2 Incentive Compensation. Employee will be eligible to earn incentive compensation. All bonus payments will be made less required deductions for state and federal withholding tax, social security, and other employment taxes and payroll deductions.
4.4 Stock Compensation. Employee will be granted stock purchase rights under the Cynosure Stock Compensation Plan in accordance with the draft Stock Compensation Plan, Stock Purchase Rights Agreement, and Tax Bonus attached hereto, as soon as possible after approval by the Company’s shareholders and directors.
7.2 Termination Without Cause by Company/Severance. Company may terminate Employee’s employment under this Agreement without Cause at any time after the Initial Term on thirty (30) days’ advance written notice to Employee. In the event any such termination shall occur within 540 days following the date hereof, such employee shall receive the payments set forth in Section 6.1 of the Subscription Agreement between El. En. and the Company, dated May 3, 2002. In the event any such termination shall occur thereafter, Employee will receive the Base Salary, accrued bonus and fringe benefits then in effect, prorated to the date of termination, and a “Severance Payment” equivalent to twelve (12) months of Employee’s Base Salary, accrued bonus and fringe benefits then in effect on the date of termination, provided that Employee, (a) complies with all surviving provisions of this Agreement as specified in subsection 14.8 below; and (b) executes a full general release, releasing all claims, known or unknown, that Employee may have against Company arising out of or any way related to Employee’s employment or termination of employment with Company.
* * *
7.5 Termination of Employment Upon Nonrenewal. In the event either pariy decides not to renew this Agreement for a subsequent three (3)-year term in accordance with subsection 3.2 above, the Agreement will expire, Employee’s employment with Company will terminate and Employee will only be entitled to Employee’s Base Salary, accrued bonus and fringe benefits paid through the last day of the then current term. All other Company obligations to Employee pursuant to this Agreement will become automatically terminated and completely extinguished, except for the repurchase of accrued stock purchase rights or shares underlying options. In addition, Employee will not be entitled to the Severance Payment described in subsection 7.2 above.
Section 15 of Crespo’s employment agreement was an integration clause, set forth in language common to such provisions.
On July 30, 2003, Cynosure’s board and shareholders approved the “Cynosure 2003 Stock Compensation Plan." The plan as approved provided in section 5 that “(e]ach grant shall be evidenced by a written agreement which shall specify the number of shares of Stock, [and] the Exercise Price, if any, pertaining to such Grant . . .” Each participating employee signed an agreement in one of two alternative forms, with or without a so-called “put” right. In a cover memorandum transmitting a draft of the Stock Purchase Rights Agreement, Crespo described the effect of the “put” option: “It gives the participant a guarantee, but it means higher taxes.[5]
Crespo signed his Stock Purchase Rights Agreement on July 31, 2003. He did not select the “put” option. Crespo’s agreement recited that “Company is desirous of selling shares of common stock of Company to Participant pursuant to the Plan, and upon favorable terms in the event that one or more of certain events occurs,” and that “Participant is desirous of purchasing said shares upon such favorable terms in the event that one or more of said events occurs.” The agreement provided, in section 1.1, that “Company agrees to sell, and Participant agrees to buy” a number of shares determined by a formula set forth, upon the first to occur of either December 31, 2004, or certain triggering events that did not occur. Section 2.0 of the agreement set a purchase price of $2.00 per share. Section 3, labeled “Call Right,” provided at 3.1 that “(a]t December 31, 2004, . . . Company or El En has the right, at its discretion, to purchase Participant’s rights under this agreement by making a payment to Participant equal to the excess of the value of Participant’s Shares over the purchase price Participant would otherwise be obligated to pay to Company pursuant to this Agreement.” Section 7 of the agreement is an integration provision.
On September 9, 2003, Cynosure terminated the employment of another executive, Shaun K. Cave, without cause. The company paid Cave severance payments equivalent to twelve months’ salary, pursuant to the second sentence of section 7.2 of Cave’s employment agreement, which was identical to Crespo’s employment agreement. Crespo, as general counsel, reported to Andrea Cangioli, a director of the company, that Cave had agreed to severance in that amount.[6]
Cynosure terminated Crespo’s employment, without cause, effective December 12, 2003. At the time of the termination, Frank DePiano, Cynosure’s Chief Financial Officer, gave Crespo a letter, dated December 11, 2003, stating as follows:[7]
This letter is to address your choices regarding your Stock Purchase Rights. The following are your two choices:
*392 1. Immediate payment as per the $69,259 per right (40,741 total vested rights at $1.70 per right) as calculated with Shaun Cave.
2. Receive a payout on your 2/3 vested shares (40,741) based on a calculation moving into 12/31/04, per the agreement, and receive payment in April of 2005.
Please confirm which scenario you prefer. Thank you for your assistance in this matter.
Crespo entered his choice of the second option, countersigned the letter, and returned it to DePiano. At his deposition, Crespo gave the following testimony regarding this letter:
Q. The December 2003 agreement, or letter agreement, rather, is it your testimony that that was intended to effect the terms of your prior existing agreement with Cynosure that you would receive a bonus?
A. Yes.
Q. It’s not a new agreement, is it?
A. The letter was new. I’m trying to . . .
Q. Does the letter itself constitute an agreement absent the prior agreement?
A. No. It refers I believe to the purchase of the stock purchase rights.
Q. So the letter is simply an attempt to carry out a preexisting agreement, it is not in fact a new agreement, correct?
A. Yes.
Q. Just to make sure I’ve got this clear, Exhibit 10 is intended to cany out a preexisting agreement to pay you a bonus, correct?
A. Yes.
Q. The preexisting agreement to pay you a bonus is set forth in Exhibit 9, the Stock Purchase Right Agreement, correct?
A. Yes.
Crespo did not purchase any shares of stock in Cynosure on December 31, 2004, or, as far as the record discloses, at any other time.
Crespo filed his initial complaint in June 2005, followed by two amended complaints. Cynosure filed two motions to dismiss, which resulted in two decisions of Judge Gants, dismissing all claims but two: count I, alleging breach of the employment agreement by termination without cause within the initial period, and count III, alleging breach of a contract “to buy-out Crespo’s rights to purchase 40,741 shares of Cynosure stock, by payment to be received by Crespo in April 2005.” In dismissing the other counts, Judge Gants ruled that the Stock Purchase Rights Agreement gave the Company the right to purchase Crespo’s stock purchase rights, not the obligation to do so, and that it “provided the possibility of a bonus, but not the promise of a bonus.” Judge Gants declined to dismiss count I, concluding that it was ambiguous as to whether the Company could terminate the employee without cause during the initial term. This Court treats these rulings as the law of the case. See Peterson v. Hopson, 306 Mass. 597, 599 (1940) (“Where there has been no change of circumstances, a court or judge is not bound to reconsider a case, an issue, or a question of fact or law, once decided”).
Since Judge Gants’s rulings on the motions to dismiss, the parties have completed discovery. Cynosure now moves for summary judgment on the two remaining claims. With respect to count I, it argues that the evidence elicited in discovery only supports its interpretation of the employment contract as permitting termination without cause at any time. As to count III, Cynosure argues that the evidence establishes the absence of any agreement respecting Crespo’s stock purchase rights other than the written Stock Purchase Rights Agreement, which has already been construed to grant Crespo no right to require the Company to purchase his stock purchase rights. The Court agrees.
DISCUSSION
This Court grants summary judgment only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. See Cassesso v. Commissioner of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The moving parly bears the burden of affirmatively demonstrating that there is no genuine dispute of material fact on every relevant issue “even if he would have no burden on an issue if the case were to go to trial.” Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The moving party must demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving parly’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Commc’ns Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the nonmoving party must respond and offer evidence of specific facts establishing the existence of a genuine issue of material fact in order to defeat the motion. See Pederson, 404 Mass. at 17.
Interpretation of an unambiguous contract is a question of law. See Allstate Ins. Co. v. Bearce, 412 Mass. 442, 446-47 (1992). A contract is to be interpreted as a whole, and the Court must give effect to all of its provisions. King Features Syndicate, Inc. v. Cape Cod Broad. Co., Inc., 317 Mass. 652, 654 (1945). An unambiguous agreement is enforced according to its terms. Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992). If a contract is ambiguous, parol *393 evidence is admissible “to explain the significance of terms used or to show the relations and methods of the parties in the light of which their written words are to be interpreted.” Petricca Constr. Co. v. Commonwealth, 13 Mass.App.Ct. 981 (1982), quoting Levin v. Century Indem. Co., 279 Mass. 256, 258 (1932). See also Robert Industries, Inc. v. Spence, 362 Mass. 751, 753-54 (1973) (if a written agreement “is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms"). However, even where an agreement is ambiguous, if parol evidence fails to give rise to a genuine dispute as to the agreement’s meaning, the Court must nonetheless interpret the agreement as a matter of law. Gross v. Prudential Insurance Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999) (“The interpretation of a contract [also] presents a question of law for the court, except to the extent disputed facts bear upon such interpretation”) (internal quotations omitted).
1. Count I.
The employment agreement in issue here is hardly a model of clarity. It sets an initial three-year term of employment, at section 3.1, subject to automatic renewal for further three-year terms, pursuant to section 3.2, absent substantial advance notice of non-renewal. It then provides at section 7 for termination, with or without cause. Section 7.2, which governs termination without cause by the Company, consists of three sentences. The first authorizes termination without cause “at any time after the Initial Term on thirty (30) days’ advance written notice.” This sentence, read alone, would seem to imply, without expressly stating, that termination without cause is permitted only after the initial term; that is, that the employee is guaranteed employment for at least the initial term, absent cause for termination. The second sentence, however, belies that implication, explicitly referencing and providing for the possibility of “such termination” (that is, termination without cause) within 540 days. The third sentence provides for “such termination” (again, termination without cause) “thereafter.” Following the second sentence, “thereafter” in the third appears to refer to after the first 540 days — that is, the second half of the initial three-year term, as well as any part of any subsequent three-year term after renewal. If the second sentence were not present, however, and the third followed directly from the first, “thereafter” would seem to refer to after the initial term, although the word itself would be redundant.
The first and second sentences of section 7.2 are in obvious tension, but not direct contradiction. Each can be read as authorizing termination without cause, the first sentence after the initial term, and the second sentence during the first part of the initial term, with the second and third outlining the benefits due on termination without cause depending on its timing. However, that reading renders the reference in the first sentence to the initial term essentially surplusage, since, under the second and third sentences, expiration of the initial term would have no consequence with respect to termination without cause. Basic principles of construction counsel against reading contract provisions in a manner that renders any phrase or provision surplusage, although those principles do not prohibit such a reading when necessary to produce a coherent result. See J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 795 (1986); Shea v. Bay State Gas Co., 383 Mass. 218, 225 (1981). Here, before consideration of any parol evidence, the language of the contract in itself identifies that reading as the only coherent one, albeit not without its difficulty.[8] The question raised on summary judgment, then, is whether the record provides evidence to support an alternative reading.
The alternative reading Crespo proposes is that termination without cause is permitted only after the initial term. He justifies that reading by arguing that inclusion of the second sentence was simply a mistake — a carryover from an earlier draft. The problem with this theory is that Crespo offers no admissible evidence to support it. The evidence regarding prior drafts indicates that each included authorization for termination without cause at any time; none provided guaranteed employment for a fixed term. The form employment agreement referenced in the Subscription Agreement included section 7.2 in the same form that appears in the agreement that Crespo later executed, and the Subscription Agreement itself included the same language. Nor does Crespo offer testimony that, during the negotiations in which he participated, the parties ever agreed to remove the second sentence.
The evidence of the parties’ conduct also tends to support Cynosure’s interpretation of the contract, and refute Crespo’s. “There is no surer way to find out what parties meant, than to see what they have done.” Martino v. First Nat’l Bank of Boston, 361 Mass. 325, 332 (1972), quoting Pittsfield & North Adams R.R. v. Boston & Albany R.R., 260 Mass. 390, 398 (1927). In terminating both Cave and Crespo within the first year of the agreements, the Company applied the second sentence of section 7.2. Neither of them, as far as the record discloses, protested that such termination was not authorized by the agreement. Crespo took that position only months later, after the dispute arose regarding the purchase of his stock purchase rights, by filing his complaint in this action.
Section 7.2 is indeed ambiguous, as Judge Gants ruled and both parties acknowledge. Ambiguity alone, however, does not establish the existence of a genuine dispute of material fact for trial. See Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. at 119, supra. See also Nadherny v. Roseland Prop. Co., Inc., 390 F.3d 44, 48-49 (“[i]f, despite the ambiguity, no *394 reasonable person could interpret the contract as one party does, the court may enter judgment against that party”). Where, as here, the extrinsic evidence all points to a single interpretation, which is permissible within the language of the agreement, the Court must adopt that interpretation. The defendant is entitled to judgment as a matter of law on count I.
2. Count III.
Count III is somewhat obscure as pled, but receives clarification in Crespo’s opposition to the present motion: he contends that the December 12, 2003, letter agreement constitutes a new agreement, separate from the Stock Purchase Right Agreement, under which the Company obligated itself to buy his stock purchase rights. The problem with this theory is that no evidence supports it, and Crespo’s own deposition testimony refutes it.[9] As set forth supra, Crespo testified that the letter was intended to carry out the Stock Purchase Right Agreement. Nothing in the record indicates otherwise.
At argument on the present motion, Crespo suggested a different theory, not presented in his memorandum: the letter agreement was a statement by the company of its exercise of discretion to purchase Crespo’s rights under the Stock Purchase Right Agreement. The theory is not implausible on the face of the document. Here again, however, it lacks any support in the evidence. Crespo did not testify that he understood the letter in that manner, nor does the record include anything from El En or anyone on its behalf to indicate that was its intention. The Court therefore concludes that the defendant is entitled to judgment as a matter of law on count III.
CONCLUSION AND ORDER
For the reasons stated, the Defendant’s Motion for Summary Judgment and Motion to Strike Affidavit are ALLOWED.

The exhibits submitted with the motion package include a copy of an affidavit of Horace Furumoto, the original of which, counsel informed the Court at argument, was prepared and submitted to the Court in connection with an earlier motion to dismiss. Counsel have further informed the Court that Mr. Furumoto is now deceased. Defendant has moved to strike the affidavit as hearsay not falling within any exception. Plaintiff has not offered a theory on which the affidavit would be admissible at trial. The Court notes that G.L.c. 233, §65, would authorize admission of the affidavit at trial if the plaintiff could establish that it “was made in good faith and upon the personal knowledge of the declarant.” Plaintiff has not offered a basis for the Court to find those requirements are met. Accordingly, the Court will allow the motion to strike and will not consider the affidavit.

The defendant, as moving party, has submitted a statement of undisputed material facts in compliance with Superior Court Rule 9A(b)(5). The form of the plaintiffs response does not comply with the requirements of the rule, making the Court’s task in seeking to identify any factual dispute unnecessarily difficult. The Court has nevertheless examined the evidentiary materials cited by the plaintiff and included in the motion package, in an effort to determine whether any material facts are genuinely disputed. As to many of the paragraphs of the defendant’s statement, although the plaintiff asserts the existence of a factual dispute, he fails to cite any evidentiary material indicating the existence of a dispute. In certain instances, the plaintiff cites deposition testimony appearing on transcript pages that have not been supplied to the Court in the motion package; the Court is unable to consider that testimony. The plaintiff has not submitted “a concise statement of any additional material facts as to which the opposing party contends there is a genuine issue to be tried,” as permitted by the rule. He has included certain assertions of additional facts, without record references, in his response to the defendant’s statement. The Court disregards those assertions as not in compliance with the rule.

The defendant’s Rule 9A(b)(5) statement says that a form employment agreement, which the parties have provided as an exhibit, was attached to the subscription agreement. Defendant cites deposition testimony of Andrea Cangioli, a director of El En, stating “that was the form.” Plaintiff disputes that the form employment agreement was actually attached to the subscription agreement, but does not appear to dispute that the form submitted as an exhibit was the form the parties had agreed to at the time of the subscription agreement.

The defendant asserts that Crespo “led that effort on behalf of Cynosure,” citing Cangioli’s deposition testimony to that effect, along with Crespo’s acknowledgment in his deposition testimony that his responsibilities as general counsel included reviewing drafts of contracts. The plaintiffs response disputes that he Ted” the effort, and asserts instead that he was merely “the scrivener of changes recommended by others and . . . made some suggested changes.” He cites a page from his own deposition transcript that has not been provided to the Court. It appears undisputed that Crespo participated in the negotiations: the Court does not view any dispute about Crespo’s precise role as material to the issues presented by this motion.

Apparently the company’s auditors had advised that, if the agreement were structured such that the Company had discretion whether to purchase the employee’s rights or not, the purchase price received by the employee would be treated as capital gain: if the company were contractually bound to purchase the employee’s rights, the payment would be treated as ordinary income. According to Crespo, the whole purpose of the Stock Compensation Plan and the Stock Purchase Right Agreement was to obtain capital gains treatment for a payment that was actually intended as a bonus.

In the same communication Crespo reported that Cave had agreed to “selling his vested stock purchase rights ... at a ‘current’ share value of $3.70.” Cave had opted for the “put” provision in his Stock Purchase Rights Agreement.

Electronic mail communications provided in the record indicate that DePiano cleared the letter with Cangioli before presenting it to Crespo. Those communications do not shed light on the purpose of the letter, or any effect DePiano or Cangioli intended it to have beyond establishing agreement to a value of the stock at that time, for purposes of calculation of the value of the rights.

The Court is not particularly persuaded by the defendant’s argument based on the phrase in section 3.1 “unless sooner terminated in accordance with Section 7 below.” Section 7 includes, in addition to section 7.2 regarding termination without cause, section 7.1, regarding termination for cause. Section 3.1 could refer only to termination within the initial term for cause under section 7.1.

A second problem with this theory, which the parties have not addressed, is that no consideration appears for a new agreement.