HENRIETTA F. MYERS & others[1] *vs.* JOHN C. SALIN
& another.[2]

Suffolk. November 12, 1981. — February 3, 1982.

Present: ARMSTRONG, CUTTER, & KASS, JJ.

*Beach. Real Property*, Easement, Beach, Restrictions, Registered land:
certificate of title. *Laches. Deed*, Construction. *Easement.*

In an action seeking relief against the construction of a dwelling on reg-
istered shore land, certain deed covenants, unlimited in time, purport-
ing to prevent building upon specified land retained by the grantors,
created negative easements amounting to "restrictions" on the retained
land, which by lapse of time had expired after thirty years because of
G. L. c. 184, § 23. [133-136]
In an action seeking relief against the construction of a dwelling on reg-
istered shore land, the title certificate to such land, which made general
reference to the existence of easements and an explicit reference to deeds
containing beach rights and a right of way, satisfied G. L. c. 185, §§ 46
and 47, by making adequate reference in the circumstances to the af-
firmative easements claimed under those deeds. [136-137]
Neighboring property owners who delayed for two years in bringing
an action for relief against the construction of a dwelling on registered
shore land were barred by laches from obtaining injunctive relief against
the construction, in which significant expenditures had been incurred
[137-140]; however, with respect to their shore rights and right of way,
as impeded by a steepened bank and the planting of shrubbery, the ex-
penditures were not so substantial or so early in time as to amount to the
prejudice necessary to sustain the defense of laches [140-141].
A Land Court judge's interpretation of the grantors' use of the phrase
"free use of the beach and shore for . . . boating and bathing" in cer-
tain deeds to include the right to use an adjacent steepened bank was
supported by the instruments creating the easements. [141-142]

---

[1] Sally S. Bouthillier, Benjamin F. and Virginia B. Dow, Leo T. and
Sara L. Chylack.

[2] Judith D. Salin, wife of John C. Salin. In the original complaint, filed
November 27, 1978, the inspector of buildings of Duxbury was named as
a defendant. The complaint was discontinued against him.

In an action for relief against the construction of a dwelling on registered shore land and to protect the shore rights and a right of way of the neighbors, there was no merit to the contention by the owners of the locus that the easements given by certain deeds had been extinguished as to land held by the owner in his own right during a brief period when he and his wife owned the locus as tenants by the entirety. [142]

In an action for relief against the construction of a dwelling on registered shore land and to protect the shore rights and a right of way of the neighbors, there was no evidence that one of the neighbors placed any undue burden on the easements, despite the fact that he lived in a house on a parcel adjacent to the narrow parcel to which the easements created by certain deeds were appurtenant. [142-143]

CIVIL ACTION commenced in the Land Court Department on November 27, 1978.

The case was heard by *Randall, J.*

*Joseph J. Hurley* (*Stuart R. Malis* with him) for the defendants.

*Stuart DeBard* for the plaintiffs.

CUTTER, J. This complaint, filed by neighbors of the defendants (the Salins) in the Land Court on November 27, 1978, and later amended, seeks relief against the Salins' construction of a dwelling on their registered shore land in Duxbury (the locus). There was a three-day trial before a Land Court judge who also took a view of the locus and the surrounding area. Thereafter he made detailed written findings, on the basis of which judgment was entered declaring the rights of the parties and directing the Salins within nine months to remove their dwelling to another location and to restore to its former condition the easterly extension of Bradford Road to the shore toward Duxbury Bay. Other minor relief was granted to the plaintiff Mrs. Myers and (on a counterclaim) against three of the plaintiffs. The Salins have appealed and the plaintiffs appeal on one issue.

A. The locus and certain other properties in the area are shown on the plan (based upon the plan attached by the Land Court judge to his decision). The Salins, as tenants by the entirety, acquired the locus on July 21, 1972, and their

Land Court certificate of title contains the provisions set out in the margin.[3]  Each plaintiff owns land near the locus and bases his or her contentions on covenants contained in one of the three deeds (hereafter the Whittington deeds) to Helen Perry Whittington referred to in n.3, subparagraph [1]. Each of the plaintiffs, except the Dows, derives title from one of the Whittington deeds.  The Dows derive title to a strip of land ten feet wide from one of these deeds, but their title to other land (on which the Dow house stands) comes from another source.  The plaintiff Bouthillier, by deed from John Salin, owns land which John Salin owned at the time that Salin and his wife, as tenants by the entirety, owned the locus.

B.  The Whittington deeds each contained (1) a covenant by the grantor not to build (or to sell without restricting the rights of future grantees to build) on an area encompassing the location of the new Salin dwelling; (2) a reservation in behalf of the grantors of the deeds to Mrs. Whittington of

---

[3] For convenience of reference, the provisions are given numbers (in brackets) below.

"[1]  The above described land is subject to agreements, not to erect buildings south of the northerly side of the way thirty (30) feet wide extended . . . contained in three deeds to Helen Perry Whittington, one by Standish Shore Incorporated, dated August 30, 1919 . . . Book 1347, Page 432, one by William Orrell et al, dated September 27, 1915 . . . Book 1222, Page 342, and one by said Standish Shore Incorporated, dated August 19, 1916 . . . Book 1261, Page 251, so far as in force and effect at date of original decree.  [The original decree was dated September 30, 1955.]

"[2]  So much of said lots as is included within the limits of the way thirty (30) feet wide . . . is subject to any and all rights in and over the same of all persons lawfully entitled thereto, by grant, implication or otherwise, having a right of access to and from the shore or beach, and there is appurtenant to said lot the right to use the whole of said way thirty (30) feet wide, shown on said plan, in common with all other persons lawfully entitled thereto.

"[3]  So much of the above described land between the top of the bank, as existing from time to time, and extreme low water, is subject to any and all rights, easements and restrictions by grant, reservation or otherwise, in and over the same existing at date of original decree."

the right to build bath houses on an area including that where the Salins' dwelling has been placed; (3) beach rights as listed in the margin;[4] and (4) a right of way over Bradford Road (including the thirty-foot wide extension). Other provisions concerning the construction of bath houses do not seem to be directly relevant.[5]

C. The dwelling (marked "Salin House" on plan), the subject of the present litigation, was constructed by the Salins upon (and set into) a bank west of the sandy portion of the shore. When excavation and foundation construction was started in November, 1976, the bank was covered by beach grass, bushes, shrubs, and some trees. Percolation tests had been made as early as May, 1976. Shortly after starting excavation in November, 1976, the Salins invited all the plaintiffs to attend a meeting at their then house (overlooking the locus) to discuss their building plans, at a time

[4] The beach and shore rights granted to Mrs. Whittington for the Myers property by the 1915 deed to her from William Orrell and Howard D. Brewer extend from the Orrell line on the south to the northerly edge (line R-R) of the thirty-foot wide way, either part of, or an extension of, Bradford Road. The beach rights granted to Mrs. Whittington by the 1915 deed of Standish Shore Incorporated of the Bouthillier and Chylack properties run from the Orrell line on the south to the southerly edge (line Q-Q) of the thirty-foot wide way as extended. These beach rights in each case, so the Land Court judge found, encompass the Salins' dwelling location. Discussion of the westerly boundary of the area subject to beach rights appears in part 6 of this opinion. The deeds of Standish Shore Incorporated show that William Orrell was president of that corporation and Howard D. Brewer was in one instance its clerk and in another instance its treasurer.

[5] The record does not show clearly where title to the locus was at the time (1915, 1916, 1919) of the deeds mentioned in n.3, subparagraph [1]. The decision of the Land Court judge seems to assume that it was in the grantor in each case. Certainly the original certificate of title of the locus and other land in 1955 and the transfer certificate of title of the Salins, July 21, 1972, would not have listed as encumbrances the covenants against building south of the northerly boundary of Bradford Road as extended in the three Whittington deeds if these covenants had not been effective at least at the time they were made. The 1935 and 1940 deeds from Standish Shore Incorporated to Mrs. Whittington and a 1946 deed to Howard D. Brewer of all the corporation's then remaining land may tend to support the judge's assumption at least as to the 1916 and 1919 deeds from Standish Shore Incorporated to Mrs. Whittington.

when "just the foundation had been put in." Only Mrs. Myers, then over eighty years old and "frail," did not attend. Salin presented architectural drawings and a plot plan for review. There was testimony that at this meeting the neighbors were surprised at the construction and that there was "generally a subtle expression of opposition to the plan" on the ground that it involved "an infringement of beach rights." There had been a prior meeting of the group without the Salins. Some, at least, of the plaintiffs consulted their attorneys during late 1976, 1977, and 1978, and made an effort to ascertain precisely what their beach rights and other legal claims to object were. The plaintiffs' investigations proceeded somewhat slowly. The judge, nevertheless, found that the plaintiffs were "unaware of the rights referred to in . . . [the Whittington] deeds until the fall of 1978," and some "were misled by beach rights in a 'T' shaped area [see the plan] at the easterly end of Bradford Road."

D. When this original complaint was filed on November 27, 1978, the frame of the Salin house was "open to the elements on one side." Other work had been done. Construction had "continued in a desultory sort of way through 1977," and "severe damage" was caused to the house by a big storm in February, 1978, necessitating some repairs in the summer of 1978 "after an insurance settlement for storm damage." The Land Court on December 20, 1978, denied a preliminary injunction to prevent the Salins from going forward with the construction because "the house was framed and [only] partially closed in" so that "added work was needed to preserve it." The Salins, however, were "advised that if they proceeded with the building they did so at their [own] risk."

E. The judge made the following further findings: (1) The westerly line of the locus "follows the top of the bank" which "slopes down to the . . . bottom some . . . [twenty-five to thirty feet] where it reaches the sand." (2) The house itself "is below the top of the bank with the foundation . . . one foot above the bottom of the bank as it existed in 1976."

The basement of the Salin house "rests in the sand of Duxbury Beach." (3) The Salins have impermissibly interfered with use of the extension of Bradford Road in a manner described below in part 4 of this opinion. (4) The Salins occupy some 900 square feet of Mrs. Myers's land with plantings and there are minor encroachments of a wall made of railroad ties (owned by the Salins) onto Mrs. Myers's lawn. (5) The Salins' house could be moved to their lot X (see plan) subject to zoning law requirements and to some relocation of sewer facilities. (6) Some, at least, of the plaintiffs have used, and have continued to use, the beach for boating and swimming.

Further facts are stated below in connection with the discussion of the several issues which have been argued.

1. The judge ruled that the covenants, unlimited in time, contained in the three Whittington deeds (1915, 1916, and 1919) created at most negative easements and thus were restrictions on the retained land of the grantors which by lapse of time had expired after thirty years, presumably because of G. L. c. 184, § 23.[6] From the judgment based on this ruling, the plaintiffs have appealed.

The judge based this ruling largely on implications from language in *Labounty* v. *Vickers*, 352 Mass. 337 (1967), which dealt with an implied easement for a right of way to a waterfront (and for beach privileges within an area constituting an extension of the implied way to the shore). The opinion (at 347-348) said, "A 'restriction of the use of land' is a right to compel the person entitled to possession not to

---

[6] Section 23, as amended by St. 1969, c. 666, § 1, reads in part (emphasis supplied),

"Conditions or restrictions, *unlimited as to time, by which the* title or *use of real property is affected,* shall be limited to the term of thirty years *after the date of the deed* or other instrument or the date of the probate of the will *creating them,* except in cases of gifts or devises for public, charitable or religious purposes. This section shall not apply to conditions or restrictions existing on July sixteenth," 1887, and certain other instruments not here pertinent. Other limitations on the enforceability of such "restrictions" are found in G. L. c. 184, §§ 26-30, as amended. See note 7, *infra.*

use it in specified ways. . . . The restriction may be imposed by a negative easement (e.g., *Ladd* v. *Boston*, 151 Mass. 585, 588 [1890]), by an equitable servitude or by a covenant running with the land. But the holder of such a restrictive right has no right to use the land on which he holds the restriction as he would if he held an affirmative easement. See . . . [2] Am. Law of Property, § 8.5 [Casner ed. 1952]. Only by a strained use of words can such an [affirmative] easement be considered a 'restriction on the use of land.' We are not inclined to construe this statutory phrase [in G. L. c. 184, § 26, prior to its amendment by St. 1969, c. 666, §§ 2 & 3][7] to include affirmative easements."[8]

The plaintiffs contend that there is no sound basis for the distinction relied on by the Land Court judge (between affirmative and negative easements[9]) as a test for deciding

---

[7] Section 26 then read in part: "All restrictions on the use of land or construction thereon which run with the land subject thereto and are imposed by covenant, agreement or otherwise . . . in any deed . . . shall be subject to this section and sections" 27 to 30. Section 28 provides that no restriction imposed before January 1, 1962, shall be enforceable after the expiration of fifty years from its imposition or January 1, 1964, whichever is later, unless certain notices of restriction are filed and recorded.

[8] The Land Court judge refers to the *Labounty* case as creating a "cryptic test" (1967 Ann. Survey of Mass. Law, § 1.2, at 19-20), and correctly concluded that a "restriction" was not confined to a restraint placed upon "land conveyed for the benefit of land retained". He pointed out and recognized that, as in this case, a "regulation . . . [could be] put on the use of the grantor's remaining land — i.e. that no building be erected in certain areas." This, he held, constituted "a regulation on . . . [the land's] use — a restriction — as compared with a right to do something on the land — i.e. pass over it — an easement."

[9] A negative easement created by a grantor's covenant to prevent the grantor from building upon his retained land near that conveyed may be as important to the grantee (see Restatement of Property § 452 [1944]) as the grant of a right of way over the land retained by the grantor. Particularly may this be true with respect to negative easements (compare *Novello* v. *Caprigno*, 276 Mass. 193, 196 [1931]) giving a right to light and air (*Ladd* v. *Boston*, 151 Mass. at 588-589) or a right to have no interference with a view. See *Attorney Gen.* v. *Vineyard Grove Co.*, 181 Mass. 507, 509 (1902); *Harrod* v. *Rigelhaupt*, 1 Mass. App. Ct. 376, 385-388 (1973); Powell, Real Property par. 414[8] (1981 & Supp. 1981); Tiffany, Real Property §§ 718 & 763 (3d ed. 1939 & Supp. 1981); Park, Real Estate Law § 290 (1981). See also *Kesseler* v. *Bowditch*, 223 Mass. 265, 269 (1916); *Maddalena* v. *Brand*, 7 Mass. App. Ct. 466, 469-470 (1979).

whether G. L. c. 184, §§ 23 & 26-30, apply to negative easements. See 2 American Law of Property §§ 8.11 & 8.12 (Casner ed. 1952). They argue that, if the asserted rights can be properly treated as "easements," either affirmative or negative, they should not be regarded as subject to the impact of G. L. c. 184, §§ 23 & 26-30.

We need not speculate about what the situation would have been if the covenants in the Whittington deeds had afforded to Mrs. Whittington the power (in order to enforce the negative easements) to go upon the grantors' retained premises to remove houses or other obstacles erected in violation of the covenants. Even such a provision might not have given the negative easement a sufficiently affirmative aspect to bring it within the *Labounty* case exemption of affirmative easements from G. L. c. 184, §§ 23 and 26-30. See *Whitney* v. *Union Ry.*, 11 Gray 359, 360, 364-367 (1858). Compare *Western Mass. Elec. Co.* v. *Sambo's of Mass., Inc.*, 8 Mass. App. Ct. 815, 828-829 & n.7 (1979). The Whittington covenants had no such affirmative aspects. They merely purport to prevent building upon certain specified land retained by the grantors. Their purpose is not made explicit as, for example, protecting the sea view of the grantee. Nothing in them places emphasis upon any special importance of the covenants to the grantee or her land, although perhaps some such significance could be inferred from the circumstances. See *Doody* v. *Spurr*, 315 Mass. 129, 133 (1943); *Pion* v. *Dwight*, 11 Mass. App. Ct. 406, 411-412 (1981); *Highway 7 Embers, Inc.* v. *Northwestern Natl. Bank*, 256 N.W.2d 271, 275-276 (Minn. 1977). The language of the covenants seems essentially undistinguishable, as to purpose and effect, from that often employed to restrain the use of real property, and building upon it, for the benefit of other land, resulting in a "restriction" enforceable on equitable principles.[10] The Legisla-

---

[10] See, e.g., *Riverbank Improvement Co.* v. *Bancroft*, 209 Mass. 217, 220-222 (1911); *Riverbank Improvement Co.* v. *Chadwick*, 228 Mass. 242, 246 (1917); *Flynn* v. *Caplan*, 234 Mass. 516, 520-521 (1920); *Snow*

ture, by enacting G. L. c. 184, §§ 23 & 26-30, and predecessors of those sections, has shown a general intention[11] that such "restrictions," with certain carefully specified exceptions, be regulated in various ways, without apparent differentiation among the types of interest thereby produced, the names given to them, or the methods used in their creation. Accordingly, we hold, in the absence of special factors not here present, that the negative easements found in the Whittington deeds are "restrictions" within the meaning of § 23. See as to §§ 26-30, Thirty-sixth Report of the Judicial Council, Pub. Doc. No. 144, at 81 (1960). The Land Court judge thus correctly ruled that the covenants had expired by lapse of time.

2. The defendants contend that the provisions of the Salins' certificate of title (see note 3, subparagraphs [2] and [3]) with respect to (a) the use of Bradford Road as extended and (b) the land "between the top of the bank . . . and extreme low water" do not refer sufficiently to the affirmative easements asserted by the plaintiffs to use Bradford Way as extended and to exercise beach rights affecting the locus granted to Mrs. Whittington by the Whittington deeds. The pertinent provisions appear in each of the Whittington deeds. Each of the Whittington deeds is referred to precisely in the earlier provision of the certificate of title already discussed. See n.3, subparagraph [1]. The defendants argue that this is an insufficient compliance with G. L. c. 185, §§ 46 & 47, concerning the effect and contents of a title certificate for registered land. The record shows that the locus was part of a large development initiated by the Duxbury

v. *Van Dam*, 291 Mass. 477, 479-481 (1935); *Sterling Realty Co.* v. *Tredennick*, 319 Mass. 153, 154-157 (1946); *Walker* v. *Sanderson*, 348 Mass. 409, 410-414 (1965); *Blakeley* v. *Gorin*, 365 Mass. 590, 594 (1974). See Park, Real Estate Law § 1119 (1981).

[11] With respect to negative easements as restrictions, the absence from §§ 23 and 26-30 of an express reference to easements such as that found in G. L. c. 184, § 25, does not seem to us of significance in the face of the apparent general statutory use of the word "restrictions" as applying to all types of land use restraints other than clearly affirmative easements. See 1967 Ann. Survey Mass. Law § 1.2, at 19-20.

Shore Company in 1871 and, as the Land Court judge notes in his decision, many persons had rights of way to the beach over what is now Bradford Road as extended and may have had beach or shore rights. In the circumstances, it may have been impractical to state with precision in the certificate of title all the persons holding an affirmative easement of passage over the extended Bradford Way and of beach and shore use. General references in the certificate to the existence of those easements may have been all that was thought to be feasible. Combined with the notice given by such general references, of the existence of rights in others, explicit reference in the certificate to each of the Whittington deeds (see note 3, subparagraph [1]) may be taken, in the circumstances, to satisfy G. L. c. 185, §§ 46 & 47, as to persons claiming under those deeds. More specific references in the certificate to the asserted easements would have been desirable and appropriate. The Salins, however, were given constructive notice by the certificate that successors in title to the properties conveyed by the Whittington deeds might have claims to a right of way to beach rights, and they had actual notice of the plaintiffs' interests if they and their conveyancers read, as they should have, the Whittington deeds in their entirety. See *Killam* v. *March*, 316 Mass. 646, 651 (1944). We hold that the certificates made adequate reference to the affirmative easements claimed under the Whittington deeds. For discussion of the sufficiency of references in title certificates, see *Butler* v. *Haley Greystone Corp.*, 347 Mass. 478, 484-486 (1964), and *S.C.*, after remand, 352 Mass. 252, 254-258 (1967). See also *Michaelson* v. *Silver Beach Improvement Assn.*, 342 Mass. 251, 259-261 (1961); *Kozdras* v. *Land/Vest Properties, Inc.*, 382 Mass. 34, 38-45 (1980).

3. The Salins contend in any event that the plaintiffs are barred by laches from objecting to the construction of the new house, even if the plaintiffs have beach rights which include that portion of the bank where the new house now stands. Laches is an affirmative defense on which the Salins have the burden of proof. *Three Sons, Inc.* v. *Phoenix*

*Ins. Co.*, 357 Mass. 271, 278 (1970). Compare *Swensen* v. *Marino*, 306 Mass. 582, 583 (1940), where the issue was whether an easement was overloaded so that the burden rested on the party relying on the easement to establish the extent of his rights, and *Goldstein* v. *Beal*, 317 Mass. 750, 757 (1945), where the issue concerned whether the then defendant had an easement to maintain a fire escape which affected the then plaintiff's land.

Whether particular circumstances establish the defense of laches is a question of fact. *Provident Co-op. Bank* v. *James Talcott, Inc.*, 358 Mass. 180, 187 (1970). See *Weinstein* v. *Tariff*, 356 Mass. 738, 739 (1970). That question is as fully open for decision on appeal in a proceeding akin to a bill in equity, where the evidence is reported, as it was open to the trial judge. *Beaudoin* v. *Sinodinos*, 313 Mass. 511, 518-519 (1943). *Goldstein* v. *Beal*, 317 Mass. at 759. To establish the defense there must be proof that the delay worked some prejudice or disadvantage to the defendant. *Norton* v. *Chioda*, 317 Mass. 446, 452 (1945). *Mastandrea* v. *Baressi*, 2 Mass. App. Ct. 54, 57 (1974). A finding concerning laches, based upon oral evidence, however, will not be disturbed unless clearly erroneous. *Stewart* v. *Finkelstone*, 206 Mass. 28, 35-36 (1910). *Sanguinetti* v. *Nantucket Constr. Co.*, 5 Mass. App. Ct. 227, 228-229, 238. (1977). Mass.R.Civ.P. 52(a), 365 Mass. 816-817 (1974). See Nolan, Equitable Remedies §§ 132 & 142 (1975 & Supp. 1981). The Land Court judge concluded that the plaintiffs had not been guilty of laches on the facts already stated. See parts C and D of the statement of facts, *supra.* His reasons are set out in the margin.[12] His discussion deals inadequately with

---

[12] The Land Court judge first stated as one reason for denying the defense of laches, that "no injunctive relief of a permanent nature was sought." This was plainly incorrect for the amended complaint prayed for a mandatory injunction that the Salins "be ordered to remove . . . [the] frame building, . . . its chimneys and foundation." The judge proceeded, "There has been a consistent effort . . . to shift the burden of going forward onto the plaintiffs once the . . . [Salins] informed them of their intention to build in the location as shown . . . . The plaintiffs acted as reasonable people. They consulted attorneys and sought various opin-

the evidence of inaction which comes from the plaintiffs themselves. Construction of the house had begun no later than November, 1976. This proceeding was not initiated until November 27, 1978. Dr. Chylack, husband of one of the plaintiffs, sought advice from his attorney in the fall of 1976, and spoke to him again periodically without getting the advice. Dow, Mrs. Bouthillier, and Mrs. Myers used the beach frequently. Dow never consulted an attorney. Mrs. Bouthillier consulted several attorneys but never obtained decisive action from any of them. She never complained to the Salins about the construction until the fall of 1978. Mrs. Myers communicated with the Salins through an attorney but only to complain about debris left on her land by the construction crews employed by the Salins.

An attorney consulted by a group of the plaintiffs and possibly others in the period 1976-1978 did some research in the registry of deeds which was inconclusive in character. He reported to a group of the Salins' neighbors that to answer their questions would require expensive and "time consuming" research. He left the meeting with the feeling that he should "do very little," perhaps until he received further instructions.

There was no evidence that the "subtle expression of opposition to the" Salins' building plans at the meeting in their house in November, 1976, was ever made articulate until this proceeding was commenced. The evidence compels the conclusion that the plaintiffs knew that the Salins were going ahead with their construction — albeit in a desultory way — and were expending substantial sums upon the work. A finding by the judge that the plaintiffs "prevailed upon the [t]own [b]uilding [c]ommissioner to issue a stop order on the construction work for some ten months" is not based on the evidence, which indicates some-

ions as to what should be done. In due course the present action was brought. The defendants proceeded here with clear notice that others might well have rights in the land. It was their duty to seek a legal determination of these rights if there was any doubt. This they did not do."

what obscurely that the stop order was issued less than two months before this proceeding began and expired in thirty days. With respect to the Salins' house, but not to the right of way and the shore rights, we are of opinion that the plaintiffs are guilty of laches because of their delay of two years in suing the Salins, while their attorneys, or some of them, conducted in a leisurely manner somewhat ineffectual research, and while they knew or should have known that the Salins were going ahead with significant expenditures on the new house. See *Loud* v. *Pendergast,* 206 Mass. 122, 125-126 (1910); *Weinstein* v. *Tariff,* 356 Mass. at 738-739; *Yetman* v. *Cambridge,* 7 Mass. App. Ct. 700, 708-709 (1979). Compare *Tehan* v. *Security Natl. Bank,* 340 Mass. 176, 182-183 (1959, where the delay caused no "substantial prejudice"); *Harrod* v. *Rigelhaupt,* 1 Mass. App. Ct. 376, 386-387 (1973, where the laches defence was rejected because of the prompt notice given by the plaintiffs of their objections). Compare also *Davenport* v. *Broadhurst,* 10 Mass. App. Ct. 182, 187 (1980). The Land Court judge was clearly erroneous in failing to recognize the defense of laches.[13] The plaintiffs waived any claims to damages at the outset of the trial. They thus, as to the house, are not entitled to any substitute for specific relief.

4. Despite our holding in part 3 of this opinion, the Salins have not established the defense of laches with respect to the plaintiffs' beach and shore rights and their right to the unimpeded use of the extension of Bradford Road as a right of way. The judge justifiably has found that "[s]ome of the plaintiffs have launched boats, using Bradford Road for access to the beach." The Salins have "steepened the bank" and "have blocked it with shrubs so that it would be difficult, if not impossible, to . . . [take] a boat or trailer over it

---

[13] Although the Salins had it in their power to seek declaratory relief concerning the correctness of their proposed actions (including the then somewhat uncertain issue discussed in part 1 of this opinion), we perceive no obligation upon the Salins to do so in the absence of substantially more definitive objections to them by the plaintiffs than this record reveals.

to the beach," as at least one plaintiff has done in the past.[14]
The expenditure for shrubbery has not been shown to have
been so substantial or so early in time as to amount to the
prejudice to the Salins necessary to sustain the defense of
laches.  The judge correctly ordered the Salins to restore the
extension of Bradford Road from the top of the bank to the
shore to its condition before the house construction began.
We interpret this order as requiring restoration of the way
so as to permit access to the beach for boats or trailers as
well as pedestrians and without any barriers such as gates.
Cf. *Stucchi* v. *Colonna*, 9 Mass. App. Ct. 851 (1980).

5. The defense of laches which leads us to reverse the
order that the Salins' house be moved makes it unnecessary
for us to consider whether presence of the house unreason-
ably interferes with the plaintiffs' beach and shore rights.
The plaintiffs, because of their careless delay, must suffer
the consequences of failing to commence this proceeding
promptly, including any harm to their beach and shore
rights caused by the presence of the house, such as shutting
off sunlight, and any invasion of the privacy of persons en-
titled to use the beach.  Obviously, the plaintiffs cannot use
the portion of the bank actually covered by the house itself.
We assume that enlightened self-interest will lead the Salins
and subsequent owners of the house to take all appropriate
steps to prevent further erosion of the bank but, if there is
failure on their part to do this to an extent which causes in-
jury to the plaintiffs' shore rights, the plaintiffs or their suc-
cessors may seek further relief.

6. The Land Court judge in his decision concluded that
the grantors in the Whittington deeds of "the free use of the
beach and shop" (*sic*, probably "shore"), or the "free use of
the beach and shore for . . . boating and bathing," included
the right to use the bank.  He interpreted these terms used

---

[14] There was evidence, confirming an earlier affidavit, that, since the
start of this proceeding, Salin has objected to this reasonable use of the
way and threatened prosecution of one of the plaintiffs for criminal
trespass.

in the Whittington deeds as referring to an area bounded on the west (see plan) by the top of the bank. We think he was justified in doing so by the boundaries used by the grantors to Mrs. Whittington, especially Standish Shore Incorporated in the 1935 and 1940 deeds (referred to in the last sentence of note 5, *supra*) to Mrs. Whittington of land adjacent to (or near) the locus which used the "top of the bank" as a boundary. This usage in those deeds had some tendency to show what the grantors of the Whittington deeds regarded as "beach and shore." The judge's interpretation also in some degree may be supported by the territorial scope of the broad restrictive covenants in the Whittington deeds, discussed in part 1 of this opinion, against any buildings on the locus. In any event, what is meant by the terms "beach" and "shore" is a matter for interpretation in the light of all relevant circumstances and of the whole of the instruments creating the easements. See *Doody* v. *Spurr*, 315 Mass. at 133-134; *Barchenski* v. *Pion*, 9 Mass. App. Ct. 896 (1980). Compare *Hewitt* v. *Perry*, 309 Mass. 100, 104-105 (1941), *S.C.* 310 Mass. 649, 650 (1942), 314 Mass. 346, 349-351 (1943). Compare also *Castor* v. *Smith*, 211 Mass. 473, 474-475 (1912); *Lund* v. *Cox*, 281 Mass. 484, 490-492 (1933).

7. There is no merit to the contention that the easements given by the Whittington deeds have been extinguished as to land on the south side of Bradford Road held by John Salin, in his own right, during a brief period when he and his wife owned the locus as tenants by the entirety. There was no such unity of ownership of this land and the locus as would lead to any such extinguishment by merger. See *O'Malley* v. *Commissioner of Pub. Works*, 340 Mass. 542, 545-546 (1960). See also Restatement of Property § 497, especially Comment b and caveat (1944), and *Krokyn* v. *Krokyn*, 378 Mass. 206, 210-211 (1979), as to the nature of a tenancy by the entirety.

8. There is no evidence that the plaintiff Dow has placed any undue burden on the easements, despite the fact that he lives in a house on a parcel adjacent to the narrow parcel to

which the easements created by the Whittington deeds are appurtenant. Compare *Brassard* v. *Flynn*, 352 Mass. 185, 189-190 (1967). It will be time enough to consider whether he in fact overburdens the easement when and if he makes a more significant or any unreasonable use of the beach rights or of the extension of Bradford Road.

9. The plaintiffs have not appealed from any part of the judgment except with respect to the issue discussed in part 1 of this opinion.

## *Conclusion*

This case is remanded to the Land Court for amendment of the judgment by striking out paragraph 4 (with respect to the effect of the presence of the Salins' house upon the plaintiffs' shore rights) and by substituting for paragraph 9 a statement that the plaintiffs are guilty of laches with respect only to their objections to the construction of the Salins' house but are not guilty of laches with respect to the Salins' unwarranted interference with the plaintiffs' access to the beach and shore area over the extension of Bradford Road and with respect to any interference (other than that caused solely by the presence of the house) with the plaintiffs' beach and shore rights. The final paragraph of the judgment is to be revised to strike out the first sentence thereof ordering the removal of the house. In other respects that paragraph may be revised as the Land Court judge may think proper after hearing, in a manner to make the paragraph conform more closely to this opinion. A provision is to be added to the judgment retaining jurisdiction of the case in the Land Court for at least two years to supervise the execution of the new judgment. The case is remanded to the Land Court for revision of the judgment in accordance with this opinion. The plaintiffs are to have costs of appeal.

*So ordered.*