Travers, J.
This is an action brought by plaintiff Exit 1 Properties Limited Partnership (“Exit 1”) against defendant Mobil Oil Corporation (“Mobil”) for selling food beverages in violation of its restrictive covenant. Mobil contends that it is not in violation of the covenant because: (1) the covenant is not in Mobil’s chain of title; (2) the covenant does not meet the requirement of M.G.L.c. 184, §30 relative to the benefit conferred on Exit 1; (3) Exit 1 is guilty of laches; and (4) the character of the area and business renders the restrictive covenant obsolete. After a trial, without jury, and based upon all the credible evidence, this Court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
Exit 1 is the owner of certain properties on Route 15, near Mashapaug Road, Sturbridge, Massachusetts. (Exit 1 has a lease arrangement with a “U.S. Foods of Sturbridge, Inc.” (apparently a subsidiary) to operate the restaurant, but this arrangement appears to be without consequence to this litigation.) Mobil is the Lessee of property abutting Exit 1 and operates a gasoline station.
On April 23, 1968, one Rodney Plimpton conveyed to Atlantic Richfield all of the property which is involved in this litigation. This deed contains a marginal note referring to the restrictive covenant at issue (Exhibit 9).
On or about February 18, 1971, Atlantic Richfield conveyed the property of which Exit 1 is the current owner to Howard Johnson Company. (Exhibit 1.) In that deed Atlantic imposed a fifty (50) year restriction on the Howard Johnson land which was conveyed to Exit 1, April 14, 1987 (Exhibit 6).
Simultaneous with the above transfer, Atlantic Richfield imposed the restrictive covenant which is the focus of this case on its remaining land. This covenant was for the benefit of Howard Johnson (operating a restaurant), and restricts the sale of certain goods on the property now occupied by Mobil. The Mobil land was conveyed by Atlantic Richfield to Perry, et ux on December 17, 1982. (Exhibit 3.) The land was leased to the Atlas Oil Co., February 2, 1984 (Exhibit 4) and assigned to Mobil, November 1, 1994 (Exhibit 5).
There are thus, two restrictive covenants, the first of which burdens the Exit 1 land and the second burdens the Mobil land.
Exit 1 has never violated its restrictive covenant which prohibits for a period of fifty (50) years the sale or advertising of petroleum products:
for the sale or advertising of any petroleum product, nor for the display of any trade mark, trade name or symbol characteristic of any petroleum product supplier or marketer for the purpose of promoting or advertising any petroleum product. . . (See Exhibit 1).
Exit 1 operates a combination “Roy Rogers” and “Sbarro” franchise restaurant on its premises. This restrictive covenant is not of concern in this case.
The Mobil restrictive covenant provides that Mobil’s land, for a period of fifty (50) years,
will not be used or permitted to be used, directly or indirectly, for a restaurant, motel or hotel or for advertising such business or for the sale of food or beverages except packaged candies, crackers and soft drinks dispensed through vending machines usually on display and sale in service stations may be sold.
It is clear that there has been some deviance by Mobil and its predecessor lessee, Atlas, from terms of the restrictive covenant in the food and beverage sales.
Recently, in the summer of 1995, Mobil applied to the Sturbridge Zoning Board of Appeals for variances and for a special permit and with its petition has filed drawings showing proposed substantial alterations in the interior and exterior of the building which would result in a combination gasoline station and convenience store on the premises.
ISSUES
Mobil raises several issues of law in defense of its deviances from the terms of the restrictive covenant. Mobil contends:
I. that the restrictive covenant is not in the Mobil chain of title;
*542 II. that the restrictive covenant does not meet the requirements ofM.G.L.c. 184, §30;
III. that the plaintiff is guilty of laches;
IV. and, that the character of the area and business operates to render the restrictive covenant obsolete.
The testimonial evidence and most of the nonchain of title exhibits deal with the food and beverage products sold on Mobil’s premises by Mobil’s predecessor, “Atlas,” and Mobil, the signs promoting the same, the volume of sales, and the layout of the customer area.
Mobil’s building is a rather typical example of the two-bay service station built in years past with restrooms, an area where customers paid for products (hereafter “customer area”), a small office for the manager and two large bays for automotive repairs and servicing. The building is fifty-seven feet long by twenty-eight feet wide. In the past, the customer area typically had displays of automotive accessory items. It was in this space that the snack food items and beverages were originally located. The area was about ten feet by thirty feet.
The station and restaurant are somewhat uniquely located — in a rural area, visible from and accessible from a major interstate highway, with no competition from similar enterprises for many miles. They share a common parking lot. Both enterprises are nonconforming uses of the premises.
The crux of the dispute is the perception by Exit 1 that what they view to be violations, present and proposed, of the covenant, are now and will in the future adversely affect their restaurant business.
For convenience, sketches of the subject property and the building are included.*
The evidence covers a time span from 1984 to the present.
In 1984, in the customer area Adas had a Pepsi-Cola, Coca Cola, candy and cigarette vending machines. They were to the left as one entered. The storage of products for the machines was in that same area. There was coffee and “danish” on the counter where payment was made. The last occupied a very small space.
Around 1987, Atlas stopped using vending machines for beverages. Candy was still dispensed by machine, with a few scattered boxes with additional items nearby. There were, instead, two, “reach-in” coolers somewhat similar in size to the machines, with shelves containing soft drinks and juices. The product and its volume, with the exception noted, remained approximately the same.
By 1989, a milk cooler and an ice cream freezer chest were added and the coffee (a coffee maker and a “pyrex” container) and packaged pastries (e.g. “Twinkies, Hostess”), and packaged chips, peanuts and crackers were moved to a counter that could be seen through the front window from the pump area in front. 1989 to 1990 was a time of considerable increase in product. It was also a time of change in the method of gasoline sales. Self-service pumps were installed which resulted in customers having to come into the station to pay for their gasoline. The increase in the food and beverage products and changes in the layout was a response to the opportunities provided by increased customer demand. The storage was moved from the customer area to the back of the building in the service bay area. There is no reference to servicing of automobiles during any part of this period. A few packaged sandwiches were put in the stand-up cooler. For a short time a hot dog steamer and a microwave oven were put in what had formerly been a service area. Occasionally, when there was a two-liter soft drink sales promotion inside in the former service area Adas would place a display outside the entry door to attract attention. The sale of noncontainer soda began in mid-1990.
It was around this time (1988 to 1990) that Richard Shelton, an executive with Exit 1, during his regular visit to their property (every three or four months) when he went into the station, probably after buying gasoline, became aware of the increase in product sales which had taken place at the Atlas Property. He called Irving Singer the principal in Atlas and in effect told him that he had previously noticed a gradual increase (or “over-flow”) in candy and snacks over the years and as a good neighbor he could “live with it,” however, he could not live with a “flood.” He received assurances from Singer that this would not occur. There was a relationship of trust and respect between Singer and Shelton.
In October 1991, Singer with members of his staff met with Shelton, presented plans and told him they wished to expand the customer area, in product, volume and area into a “convenience store.” After the meeting, Shelton wrote to Singer that he could not allow them to proceed and insisted on compliance with the covenant. Atlas complied with Shelton’s decision. About this time Atlas, also, stopped selling hot dogs and sandwiches.
Mobil purchased the station (assignment of lease) from Atlas November 1, 1994.
Since the purchase there has been a dramatic increase in kinds of product, and its volume and changes in layout. The stand-up beverage coolers have been replaced with new coolers, and the number of beverage coolers from 2 to 3. Sandwiches are being sold once again. The ice cream freezer chest was replaced. Prior to the Mobil purchase, but while it appears negotiations were being conducted, earlier in 1994, an additional freezer for “Ben & Jerry” ice cream was installed and the coffee maker, and glass container was replaced with a coffee maker and six or seven “gourmet” coffee carafes.
To properly understand who among these parties made decisions and had an understanding of the existence of the restrictions the following should be noted. Both Atlas and Exit 1 are small chain businesses with principle offices in Connecticut. Until some issue arose, the only persons who appear to have known of the restrictions were the top principles in each company. There were local managers at both *543 properties who conducted the day-to-day business. Throughout the entire period of time for both Atlas and Mobil, the service station was managed by Richard Pontbriand. It is not clear when and, if, prior to the near past, he ever learned of the restrictions. He made many of the decisions relating to the purchasing of food and snack items for resale for Atlas. He was supervised by a sales representative who came to the station each week, and the overall marketing manager. Of these last two, there is no evidence the representative ever knew of the restriction and the manager clearly did not become aware of it until 1991 when he proposed the major renovation into a snack shop-convenience store in 1991 (which resulted in the meeting with Shelton). The same lack of knowledge at the local and immediate supervisory level appears to have existed with Exit 1. As has already been noted, Shelton only visited Exit l’s property two or three times each year and entered the service station more infrequently — usually when he purchased gasoline.
The two businesses differ in character. The Exit 1 property has the combination Roy Rogers-Sbarro restaurant — selling hot meals, pizza, pasta, hamburgers, etc. It does have a drink vending machine. There is seating for 150 persons. It has never sold potato chips, candy, popcorn or snacks.
The Atlas-Mobil property has never had seating and the food is generally taken outside the building by the customers. At present it has signs on the front exterior of the building advertising coffee, lottery tickets and copies (from which it can be inferred that there is a copying machine inside).
The financial records of Atlas indicate that the food
and beverage sales over the last few years were, approximately, as follows:
1990 $ 74,000
1991 139,000
1992 160,000
1993 200,000
1994 (10 months) 142,000
11/94 There has been some increase to present approximately 8 to 10% over the past year.
The profit margins for food and beverages is about 35% to 40% of sales. Gasoline, however, has a profit margin of about 10% to 11%.
The above figures make the conclusion quite clear that there has been a rapid increase in food and beverage sales since 1989. It is also clear that this is a relatively lucrative type of sales.
These observations appear to follow the pattern in the industry. Most of the Mobil stations, at present, have snack shops or convenience stores. Mobil is installing them in many of those that do not.
Mobil has submitted a plan to the Sturbridge Zoning Board of Appeals which embodies its plan for conversion of the subject station to incorporate a convenience store-snack shop.
On the exterior of the building there would be more glass area in the front of the building (so that the entire interior store area could be clearly seen by the customer from the pumps). The bay doors and rest room doors on the sides would be bricked. The canopy over the pumps would be raised and enlarged.
On the interior there would be a considerable increase in the customer area and a relocation of the restrooms forward of their present location with access from the interior rather than the exterior as it was previously. The customer floor area, away from the front, would have numerous counter and storage facilities along the exterior wall and a number of “islands” on the floor for display of products. The beverage cooler and apparently storage for other food products would be built into the storage area with reach-in access doors for the customer flush with the wall of the customer area and taking up close to practically all the wall communicating with the storage rooms in the rear of the building.
RULINGS OF LAW
Exit 1 seeks relief for Mobil’s selling of food and beverages in violation of Exit l’s restrictive covenant. Mobil contends that it is not in violation of the covenant because: (1) the covenant is not in Mobil’s chain of title; (2) the covenant does not meet the requirement of M.G.L.c. 184, §30 relative to the benefit conferred on Exit 1; (3) Exit 1 is guilty of laches: and (4) the character of the area and business operates to render the restrictive covenant obsolete. This Court finds, for the reasons discussed below, that the restrictive covenant was in Mobil’s chain of title, that the covenant was clearly imposed for the benefit of Exit 1, and that the violations of the covenant up to and including what was in existence at the Mobil property in 1990, which violations Exit 1 executive Shelton stated he could “live with,” are allowable and reasonable. Any additional violations, however, are unreasonable, and prohibited by the restrictive covenant.
A. The Restrictive Covenant is in the Chain of Mobil’s Title
In the present case, although it is not clear whether station manager Pontbriand himself was aware of the restrictive covenant, Mobil was at least on inquiry notice of the restrictive covenant in its chain of title. See Gulf Oil Corp. v. Fall River Housing Authority, 364 Mass. 492, 496-97 (1973). If Mobil had reviewed its chain of title, it would have noticed the marginal note referring to the restrictive covenant in the deed of conveyance from Plimpton, the common grantor. There is no evidence, moreover, that Mobil did not know about the restrictive covenant. Mobil’s contention that the restrictive covenant was not contained in its chain of title therefore has no merit.
*544 B. The Restrictive Covenant Does Meet M.G.L.c. 184, §30 Requirements Relative to the Benefit Conferred on Exit 1
Massachusetts General Laws Chapter 184, §30 provides, in relevant part:
No restriction shall in any proceeding be enforced or declared to be enforceable . . . unless it is determined that the restriction is at the time of the proceeding of actual and substantial benefit to a person claiming rights of enforcement. . .
In order to be enforceable, the property of plaintiffs seeking to enforce a restrictive covenant must be land which the parties to the covenant intended to benefit by the restriction, and the restriction itself must “touch and concern” the plaintiffs land. Gulf Oil, supra at 498. “The intention of the parties as to land bene-fitted may be inferred ‘from the terms of the grants, or from the situation and surrounding circumstances.’ ” Gulf Oil, supra, quoting Lovell v. Columbian Nat’l Life Ins. Co., 294 Mass. 473, 477-78 (1936). Whether the covenant is primarily against competition and thus fails to “touch and concern” the land is generally a matter of intention. Gulf Oil, supra at 499.
In the present situation, the restrictive covenant was intended to benefit Exit 1, and the covenant also “touches and concerns” the property in question by limiting its use. See Gulf Oil, supra at 500-01 (owner of gas station entitled to injunction barring another from building a gas station where restriction was not a personal covenant against competition, but clearly was intended to benefit plaintiff owner by protecting the physical use of plaintiffs property). The restrictive covenant at issue was originally written for the benefit of the previous owner of Exit l’s property, Howard Johnson, which used the property to operate a restaurant not unlike Exit l’s present “Roy Rogers” and “Sbarro” franchises. The covenant came into effect at the time of the land conveyance to Howard Johnson, February 18, 1971, and prohibited Atlantic Richfield, its successor Perry, and Atlas Oil, the previous lessor of the Mobil land, from selling food and beverages except through vending machines. Howard Johnson was likewise prohibited, by another covenant, from selling gasoline and related activities. As Exit l’s use of the land appears not greatly different from that of Howard Johnson, the covenant in question was clearly meant to benefit Exit 1 by protecting its restaurant businesses. See Gulf Oil supra.
C. Full Enforcement of the Restrictive Covenant is Prohibited Because of Laches
Laches may bar enforcement of a claim that is equitable in nature if “there has been unjustified, unreasonable, and prejudicial delay in raising a claim.” Srebnick v. Lo-Law Transit Management Inc., 29 Mass.App.Ct. 45, 49 (1990). “Whether particular circumstances establish the defense of laches is a question of fact.” Myers v. Salin, 13 Mass.App.Ct. 127, 138 (1982), quoting Provident Co-op Bank v. James Talcoll, Inc., 358 Mass. 180, 187 (1970). To establish laches there must be proof that the delay worked some prejudice or disadvantage to the defendant. See Myers, supra at 140-41 (neighboring property owners who delayed two years in bringing action waived claims and barred by laches): see also Weinstein v. Tariff, 356 Mass. 715, 738 (1970) (rescript) (plaintiffs baned for standing by “in silence for an unreasonable period of time” while defendant’s predecessor in title erected steps in violation of restriction and had plaintiffs exercised diligence, the wrong would have been prevented).
In the present situation, plaintiffs action for a full enforcement of the restrictive covenant is partially barred by laches. See Weinstein, supra. At around 1988 to 1990, Exit 1 executive Shelton waived claims previous to 1990 by telling Singer, the principal in Atlas, that while he had previously noticed an “overflow” in candy and snacks over the years, as a good neighbor he could “live with it.” Therefore, the violations of the covenant up to and including what was in existence at the Mobil property in 1990, are reasonable because Shelton failed to object to them. See Weinstein, supra. Forcing defendant to comply to the vending machine restriction which was expressly waived would inequitably disadvantage defendant. See Weinstein, supra. At that time, there were two “reach-in” coolers with shelves containing soft drinks and juices. There was also a milk cooler, an ice cream freezer chest, a coffee maker with a “pyrex” container, and a counter containing packaged pastries, chips, nuts, candy and crackers.
Shelton added, however, that he could not live with a “flood.” Therefore, he apparently only meant to waive the violations of the covenant up to that time and within reason, such that the violations would not interfere with Exit l’s “Roy Rogers” and “Sbarro” franchises. What was known to Shelton at the time and what he could “live with,” although it violated the covenant restricting the sale of such products to vending machines, is mentioned above. The “flood,” against which Shelton did not waive enforcement of the covenant are the “convenience store” groceries proposed by Singer in 1991, the selling of hot dogs and sandwiches, the additional beverage coolers and the additional “Ben & Jerry” ice cream freezer. As to the six or seven “gourmet” coffee carafes, I see no significant violation. I also see no significant violation where soda is sold in sizes other than two (2) litre, as it was in 1990. This Court finds, therefore, that the additions after 1990 are unreasonable and in violation of the covenant, such that Exit 1 is entitled to relief.
D.The Restrictive covenant is Partially Obsolete
Where the evidence shows that continued enforcement of a restriction would impede reasonable uses of the land for purposes for which it is most suitable, M.G.L.c. 184, §30[1] confers broad discretion on the court to weigh and compare the interests of the parties and the public in accordance with the statute. Blakeley v. Gorin, 365 Mass. 590, 606 (1974) (use of building for apartment-hotel complex with an inciden- *545 lal use of part of building for shops did not violate a restriction against “mercantile” uses); see also Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 102 (1979) (enforcement of covenant restricting commercial use of land can be barred by proof that it is unreasonable in time, space or product line or obstructs the public interest).
At present, there is some evidence of changes in the service station industry. Most Mobil stations have snack shops or convenience stores, and Mobil is installing them in many of those that do not. The profit margins for food and beverages is about 35% to 40% of sales, whereas gasoline has a profit margin of about 10% to 11%. Due to this change in the industry and circumstances, therefore, full enforcement of the restrictive covenant would be inequitable. See Whitinsville Plaza, supra.
This Court finds, therefore, that the covenant is partially enforceable; the portion of the covenant which is rendered obsolete should be stricken, but what remains should be enforced. See Blakeley, supra at 602-03. In weighing the purpose of the covenant to protect Exit l’s use and enjoyment of its land, it is absolutely clear that the remaining portion of the covenant prohibiting use of the Mobil land for a “restaurant; motel, or hotel or for advertising such business” is not obsolete and is thus enforceable against Mobil. See Blakeley, supra.
Mobil may only maintain, therefore, the status quo of the sale of food and beverages as it existed in 1990 within reasonable volume and limit the sale of such products to those intended for off-premise consumption. See DiStefano v. Commissioner of Revenue, 394 Mass. 315, 324-27 (1985) (“vending machines” are not considered “restaurants” for tax purposes). The use of the phrase “vending machines usually on display and sale in service stations” in the covenant was a choice of words that was, in effect, a limitation on the kinds of foods and beverages (in addition to those specifically listed) which could be sold and the quantities that could be displayed. See DiSteJano, supra at 325 (sales of prepared food products not taxable as sales of “meals” by restaurants). Therefore, even though the specific term “vending machines” is obsolete, the implied limitation of kinds and quantity is not. Moreover, the kinds and quantity were expanded by laches, or waiver or acquiescence, to that which existed in 1990. See Weinstein, supra at 738. Thus, Mobil must not sell any prepared food of the nature available on Exit l’s property and must also limit its advertising of it products accordingly. See Gulf Oil, supra at 500-01.
ORDER FOR JUDGMENT FOR THE PLAINTIFF
A permanent injunction shall issue, as follows:
1.The defendants, its agents and employees shall comply with the terms of the restrictive covenant appearing in Worcester District Deeds, Book 5101, page 180 and 181, with the exceptions stated hereafter.
2. The restriction that sales of food and beverages must be dispensed through vending machines is obsolete and unenforceable.
3. The defendants, its agents and employees are limited to the sale of food and beverages, as follows: soft drinks and juices and similar bottled beverages in two (2) reach-in coolers, a milk cooler, an ice cream freezer chest, a coffee maker and containers, a display of packaged pastries, chips, peanuts, crackers, candy and other “snacks,” and beverages packaged in containers such as bottles or cans for sale outside the coolers, and the displays of product for sale shall be limited to the approximate volume which existed in 1990 and shall be further limited to the sale of such products which are packaged by the manufacturer and intended for off-premises consumption.

Editor’s Note: The one page of sketches has not been reproduced in the reported version of this opinion.

Massachusetts General Laws Chapter 184, §30 provides, in relevant part:
No restriction determined to be of such benefit shall be enforced or declared to be enforceable, except in cases by award of money damages, if
(1) changes in the character of the properties affected or their neighborhood, in available construction materials or techniques, in access, services or facilities, in applicable public controls of land use or construction, or in any other conditions or circumstances, reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes or render it obsolete or inequitable to enforce except by way of money damages, or
(2) conduct of persons from time to time entitled to enforce the restriction has rendered it inequitable to enforce . . .