EXIT 1 PROPERTIES LIMITED PARTNERSHIP *vs*. MOBIL OIL
CORPORATION.

No. 96-P-1137.

Worcester. January 29, 1998. - April 9, 1998.

Present: KASS, SMITH, & FLANNERY, JJ.

*Real Property,* Restrictions, Covenant against competition, Covenant running
with the land. *Laches.*

A Superior Court judge correctly concluded that a covenant against competi-
tion was of substantial benefit to the party seeking enforcement and that
the covenant was reasonable. [573-576]
There was no merit to a claim that laches barred a party seeking to enforce a
restrictive covenant. [577]

CIVIL ACTION commenced in the Superior Court Department on
August 23, 1995.

The case was heard by *Herbert F. Travers, Jr.,* J.

*Kurt L. Binder* for the defendant.

*Robert E. George* for the plaintiff.

KASS, J. What Atlantic Richfield Oil Company and Howard
Johnson Company had in mind in 1971, when Atlantic Richfield
imposed a use restriction on its land along State Route 15, was
simple enough. Atlantic Richfield would sell gas and Howard
Johnson would sell food. We conclude, as did the Superior
Court judge, that the land restriction continues to be of
substantial benefit, within the meaning of G. L. c. 184, § 30, to
the occupant of the Howard Johnson parcel and is enforceable.

We summarize the subsidiary facts found by the trial judge.[1]
In 1971, Atlantic Richfield owned a parcel of land on Route 15.
On February 18 of that year, Atlantic Richfield conveyed
a portion of that real estate to Howard Johnson. That

[1]Those findings have support in the evidence, and we accept them. Mass.R-
.Civ.P. 52(a), 365 Mass. 816 (1974).

same day, Atlantic Richfield also executed (and thereafter recorded) an instrument entitled "Restrictive Covenant" by which Atlantic Richfield imposed on its remaining land, for the benefit of Howard Johnson, its successors and assigns, a restriction that, for fifty years, the remaining land

> "shall and will not be used or permitted to be used, directly or indirectly, for a restaurant, motel or hotel or for advertising such business or for the sale of food or beverages except packaged candies, crackers and soft drinks dispensed through vending machines usually on display and for sale in service stations may be sold."[2]

Howard Johnson, at the time, was a well known operator of roadside restaurants. Atlantic Richfield imposed a reciprocal restriction upon the parcel that it conveyed to Howard Johnson, that it not be used for the sale of petroleum products.

In 1994, Mobil Oil Corporation (Mobil) became the operating tenant of the gas station parcel, and Exit 1 Properties Limited Partnership (Exit 1) had become the owner of the restaurant parcel. Through an operating subsidiary, Exit 1 was running two franchise restaurants, a "Roy Rogers" and a "Sbarro." Both provided for on-the-premises eating (dining might be an inflated term). Roy Rogers featured a hamburgers, chicken, roast beef, and french fries menu and Sbarro a pizza and pasta menu.

Until 1987, the gas station (then operated by Atlas Oil Company) confined its nonpetroleum products sales to soda pop, candy, and cigarette vending machines. There were, in 1987, a coffee carafe and "danish" on the counter where customers paid for gas. This occupied a very small space. Some time in 1987, Atlas replaced the drink vending machines with "reach-in" coolers. Otherwise, the product mix and the volume of sales remained approximately the same as before.

Through 1989 and 1990, by a step at a time, the food product line available at the gas station grew and the methods of sale changed. A milk reach-in cooler was installed and then an ice cream chest. Packaged pastries, packaged chips, peanuts, and crackers were displayed on a counter rather than sold through vending machines. Then some packaged sandwiches became

---

[2]We have set out the clause exactly as written. We do not endorse its syntax.

available. Next, the gas station management set up a hot dog steamer and provided a microwave oven in which customers could "nuke" items that would benefit from thawing or heating. An executive of Exit 1, Richard Shelton, noticed the accretion of food service at the gas station. Shelton called the principal of Atlas Oil Company, Irving Singer, to say he could live with a little "overflow" in candy and snacks but not a "flood." Singer said he would respect that limitation. In October, 1991, there were some discussions between Shelton and Singer about operating a "convenience store" at the gas station. Shelton said he could not accept more food business on the gas station site and would insist on compliance with the restrictive covenant. Atlas acquiesced and, indeed, rather than expanding the food line, cut out the hot dogs and sandwiches.

Mobil in 1994 was distinctively expansive. The whole layout in the customer area of the gas station was altered to emphasize food sales. Sandwiches returned as a product line. The beverage coolers grew from two to three and there was a specialty ice cream (Ben & Jerry) chest. A coffee bar offered six or seven "gourmet" coffees from carafes. By 1994, annual food sales were in the range of $170,000 per year compared to $74,000 in 1990. With a profit margin of 35% to 40% on food sales compared to from 10% to 11% on gasoline, the incentive to push food was considerable. It was at this point that Exit 1 made its stand. On August 23, 1995, it filed a complaint to enjoin violation of the restrictive covenant.

1. *Application of G. L. c. 184, § 30.* Mobil urges that because the trial judge did not, in so many words, find that the restrictive covenant is of substantial benefit to Exit 1, the covenant ought not to be enforced, and that, in any event, the evidence does not support a conclusion that the restriction is of substantial benefit to Exit 1. These contentions are based on so much of G. L. c. 184, § 30, as inserted by St. 1961, c. 448, § 1, as provides:

> "No restriction shall in any proceeding be enforced or declared to be enforceable . . . unless it is determined that the restriction is at the time of the proceeding of actual and substantial benefit to a person claiming rights of enforcement."

In his thorough memorandum of decision, the judge wrote, "the

covenant in question was clearly meant to benefit Exit 1 by protecting its restaurant business.'' Mobil objects that the language quoted falls short of a determination that at the time of trial Exit 1 *was*, in fact, deriving a substantial benefit from the restriction. But this is surely a cavil. The judge's findings describe the mutual purpose of Atlantic Richfield and Howard Johnson to prevent poaching by either party on the other's line of business. The judge's findings also describe the widening scope of food sales on the autombile service station parcel. It requires no leap of the imagination to understand that to the extent carry-out food more substantial than a candy bar or package of crackers was conveniently available where customers paid for gas, some of those customers would buy something to eat then and there and would be lost as food customers by Roy Rogers and Sbarro. Conversely, customers limited to a choice of peanut crackers and a can of Pepsi-Cola were more likely to opt for the heady delights of the restaurants next door. It is not of consequence that Mobil's offerings were different than those of Roy Rogers and Sbarro; it was food, and offered the customer an eating alternative, i.e., what the use restriction was designed to prevent.

Covenants against competition, such as the restriction we consider in this case, may run with the land and are enforceable if "consistent with a reasonable over-all purpose to develop real estate for commercial use." *Whitinsville Plaza, Inc.* v. *Kotseas*, 378 Mass. 85, 97-98 (1979). In its origins, the restriction was reasonable. Each party invested capital on the strength of an arrangement that it would draw customers travelling on the Boston and New York run, reinforced by the other's business, and not compete with one another. It is no less reasonable twenty years later because the successor of one of the parties finds it tempting to be in both businesses. Purpose, geographic extent, and duration are among criteria for testing reasonability. Restatement (Third) of Property: Servitudes § 3.6 comment b (Tentative Draft No. 2, 1991). See, as examples, of the application of restrictive covenants: *Webster* v. *Star Distrib. Co.*, 241 Ga. 270, 272 (1978); *Hall* v. *American Oil Co.*, 504 S.W.2d 313, 318-319 (Mo. Ct. App. 1973); *Davidson Bros.* v. *D. Katz & Sons, Inc.*, 121 N.J. 196, 198, 210-212 (1990); *Vermont Natl. Bank* v. *Chittenden Trust Co.*, 143 Vt. 257, 261-262 (1983). Cf. *Jetro Cash & Carry Enterprises, Inc.* v. *Food Distrib. Center*, 569 F. Supp. 1404, 1415-1516 (E.D. Pa. 1983). The purpose here is

limited, the geographic area is compact, and the duration at this juncture is not inconsistent with the useful life of buildings.

Mobil looks to *Garland* v. *Rosenshein*, 420 Mass. 319, 321 (1995), as a source of support for not enforcing the restriction, but that case gives Mobil no help. In *Garland*, the only value of the restriction to the person attempting to enforce it was the "hold-up price," i.e., what somebody might be willing to pay to secure release of the restriction. The restriction was not of any use to the party attempting to enforce it in terms of any business that party was carrying on or any real estate development project that party was undertaking or contemplating. By contrast, in the case before us, the restriction against food sales on the gas station site is of current utility to the party that owns the restaurant site. For a somewhat similar restriction in a lease, see *Kobayashi* v. *Orion Ventures, Inc.*, 42 Mass. App. Ct. 492 (1997).

2. *Is the restriction unenforceable because it is obsolete?* The judge found that the trend in the operation of highway automobile service stations was to integrate into them a convenience store at which a large number of items that might attract drivers were for sale and that, to that degree, a restriction limiting service stations to selling food by vending machine was obsolete. One may well question that conclusion of obsolescence — it is more a conclusion of law than a finding of fact — because the abandonment of machine vending by the gas station operators does not make that limitation at all obsolete to the competing restaurateur. Customers cannot touch and feel a product inside a vending machine and they need the right coins or bills to feed into the machine. Such limitations favor the victualer who deals over the counter, and the proprietor of the restaurants on the Exit 1 land is entitled to resist a metamorphosis of a machine vending operation into a more competitive operation, even if that reflects a more up-to-date service station.

We need neither belabor nor answer the question of the obsolescence of the restriction to vending machine sales because Exit 1 accepts the nature and scale of operations at the gas station site as it was in 1990, and, more specifically, accepts the scale of operations that the judge allowed Mobil in his order:

"[S]ale of food and beverages, as follows: soft drinks and juices and similar bottle beverages in two (2) reach-in

coolers, a milk cooler, an ice cream freezer chest, a coffee maker and containers, a display of packaged pastries, chips, peanuts, crackers, candy and other 'snacks', and the beverages packaged in containers such as bottles or cans for sale outside the coolers, and the displays of product for sale shall be limited to the approximate volume which existed in 1990 and shall be further limited to the sale of such products which are packaged by the manufacturer and intended for off-premises consumption."

Mobil argues that once the trial judge found a part of the restriction obsolete, he was bound by G. L. c. 184, § 30, to limit Exit 1's remedy to money damages. The basis of that contention is a clause in § 30, as inserted by St. 1961, c. 448, § 1, that reads:

"No restriction determined to be of such benefit shall be enforced or declared to be enforceable, except in appropriate cases by award of money damages, if (1) changes in the character of the properties affected . . . or in any other conditions or circumstances, reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes or render it obsolete or inequitable to enforce except by award of money damages."

The judge, however, as we have observed, found considerable pertinence in the original purpose of the restriction. The "need for the restriction," therefore, had not been materially reduced. Contrast *Blakeley* v. *Gorin*, 365 Mass. 590, 602 (1974), in which restrictions on the depth of cellar holes or the erection of stables in the Back Bay section of Boston in the 1970's were understandably determined to be obsolete — although a restriction against mercantile use was not. Assuming, for discussion purposes, a legally sound basis for judging the vending machine component of the restriction to be obsolete, a court may, in enforcing a restriction on competition, adjust the restriction to make it reasonable in the circumstances of the parties at the time they bring the question before the court. See *All Stainless, Inc.* v. *Colby*, 364 Mass. 773, 778 (1974); *Kroeger* v. *Stop & Shop Co.*, 13 Mass. App. Ct. 310, 317-318 (1982). As an example of considerable judicial editing of a restrictive covenant arising out of an employment agreement, see *Wrentham Co.* v. *Cann*, 345 Mass. 737, 742-743 (1963).

3. *Laches.* There is nothing to the argument that Exit 1 was bound by laches to give up the right to enforce the restrictive covenant. Exit 1 made known in 1990 that it would tolerate some overflow (of competition) into its line of business, but not a flood. Contrast *Myers* v. *Salin*, 13 Mass. App. Ct. 127, 138-141 (1982).

*Judgment affirmed.*